Reed S. MacKENZIE, et al.,
Respondents,

v.

SUMMIT NATIONAL BANK OF ST.
PAUL, Appellant.

No. CO–84–1030.

Court of Appeals of Minnesota.

Feb. 19, 1985.

Jay B. Kelly, Opperman & Paquin, Minneapolis, for respondents.

Terrence P. Durkin, Dudley & Smith, St. Paul, for appellant.

Heard, considered and decided by PARKER, P.J., and SEDGWICK and LESLIE, JJ.

## OPINION

LESLIE, Judge.

Summit National Bank is appealing from a judgment enjoining foreclosure of a mortgage on the respondent's home. The trial court found that the bank had breached its duty to disclose to the respondent the precarious financial condition of respondent's employer when respondent agreed to mortgage his home as collateral for a bank loan to his employer. The court also found that the bank had taken no reasonable steps to repay the loan from the employer's other accounts to satisfy the mortgage on respondent's home. We reverse.

## FACTS

In 1972 the respondent, Reed MacKenzie, was employed as a salesman for a business brokerage firm. During negotiations for the sale of one of the firm's business clients, Sheet Metal Specialty Company, MacKenzie became acquainted with David Medin, who was negotiating for the company's purchase. Upon the completion of negotiations and his purchase of the business, Medin renamed it "Metalers" and hired MacKenzie to work on its financial and accounting records and procedures. MacKenzie also became the corporate secretary of Metalers.

Financial difficulties with Metalers' operation eventually resulted in a threat of foreclosure. To solve the problem, Wayne Belisle, who was an officer of the appellant Summit National Bank, and whose father had previously owned 50% of the stock in Sheet Metal Specialty Company, assisted Medin in arranging the sale and leaseback of Metalers' real estate and equipment. Belisle himself purchased and leased back Metalers' equipment. MacKenzie, in his position as corporate secretary of Metalers, guaranteed the obligations of Metalers in

connection with the sale and leaseback transactions.

In addition to Metalers, Medin controlled several other corporations, and MacKenzie served as corporate secretary of all of them. One of these other companies was known as Maxum Consolidated Industries ("MCI"). In the fall of 1977 Medin went to Wayne Belisle requesting that his bank loan MCI $775,000.00 to purchase the assets of another company. When the bank was unable to loan Medin the money, Belisle and an associate personally loaned Medin the $77,500.00 down payment, and Belisle arranged to have two other persons borrow the money from the bank for the balance of the purchase price and loan it to MCI. MacKenzie signed a guarantee for MCI on that loan.

In December 1978 the appellant bank, through Belisle, loaned MCI $65,000.00, which was secured by taking a mortgage on MacKenzie's homestead. MacKenzie signed the mortgage note as corporate secretary, and he and his wife signed a separate security agreement individually, which indicated that the appellant bank could extend the term without notification to the MacKenzies. The bank subsequently extended the note four times without notifying MacKenzie—twice after the bank had received notice that various Medin corporations, including MCI, had filed Chapter 11 bankruptcy petitions. These extensions were authorized by Medin and other individuals who falsely signed as corporate secretary of MCI.

From at least September 1978 forward, the appellant bank allowed Medin to transfer funds from one of his corporate accounts to another in order to cover checks drawn on insufficient funds. A bank vice president conferred daily with Medin to determine which funds should be shuffled between accounts. Although MacKenzie was the corporate secretary for these corporations, he was unaware of this daily shuffling and of the actual financial situation of any of the accounts.

Despite Medin's attempts to keep all of his corporations afloat, on February 4, 1980 MCI's prior Chapter 11 bankruptcy petition was converted into a Chapter 7 proceeding. When the appellant bank realized that MCI would not be able to repay the $65,000.00 loan, it initiated foreclosure proceedings on MacKenzie's home. The MacKenzies thereupon brought an action requesting that the foreclosure be enjoined, and the trial court granted their request. The bank has appealed.

## ISSUES

1. Did the appellant bank owe a duty to disclose the poor financial condition of MCI at the time MacKenzie mortgaged his home to secure the MCI loan?

2. Should the bank have repaid the MCI loan and satisfied MacKenzie's mortgage when funds were on deposit in various Medin accounts?

## ANALYSIS

### I.

The trial court found that the appellant bank owed a duty to MacKenzie to disclose MCI's poor financial condition at the time MacKenzie's home was mortgaged as security for the MCI loan. The appellant bank argues that this conclusion was erroneous, and that it had no duty to disclose the financial condition of MCI when MacKenzie agreed to put up his home as collateral for the loan.

In *Richfield Bank and Trust Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648 (1976) our supreme court noted that nondisclosure may at times constitute fraud. *Id.* at 365, 244 N.W.2d at 650. However, before a claim of fraud may be established based upon failure to disclose a certain fact, there must first be a duty, either legal or equitable, to disclose that fact. *Id.*

In the *Sjogren* case the issue addressed by the court concerned a bank's duty to disclose the financial condition of a depositor to a third party who had applied for a loan to purchase assets of that depositor. The *Sjogren* court observed that a bank is generally under a duty not to disclose the

financial condition of its depositors (*id.* at 366, 244 N.W.2d at 651), but noted that special circumstances may exist requiring disclosure, citing *Klein v. First Edina Nat. Bank,* 293 Minn. 418, 196 N.W.2d 619 (1972)—another disclosure case involving a bank. *Klein* stated:

> As a general rule, one party to a transaction has no duty to disclose material facts to the other. However, special circumstances may dictate otherwise. For example:
>
> (a) One who speaks must say enough to prevent his words from misleading the other party. *Newell v. Randall,* 32 Minn. 171, 19 N.W. 972 (1884).
>
> (b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party. *Marsh v. Webber,* 13 Minn. 109, Gil. 99 (1868).
>
> (c) One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts. See, e.g., *Wells-Dickey Trust Co. v. Lien,* 164 Minn. 307, 204 N.W. 950 (1925).

*Id.* at 421, 196 N.W.2d at 622. The *Klein* court based its decision upon a fiduciary duty to disclose and concluded:

> We believe the correct rule to be that when a bank transacts business with a depositor or other customer, it has no special duty to counsel the customer and inform him of every material fact relating to the transaction—including the bank's motive, if material, for participating in the transaction—unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.

*Id.* at 422, 196 N.W.2d at 623.

■ Applying the above rule to the present circumstances, we are compelled to find that the appellant bank had no obligation as a fiduciary to disclose to MacKenzie the financial condition of MCI. The trial court did not find that MacKenzie had placed his trust and confidence in the bank or that he had relied upon the bank to counsel and inform him. Indeed, such a finding would not have been supported by the evidence. Rather, the facts are clear that MacKenzie was a corporate officer of MCI and had at least twice before guaranteed the obligations of MCI and other Medin corporations. As stated in *Midland National Bank of Minneapolis v. Perranoski,* 299 N.W.2d 404 (Minn.1980), "[a] fiduciary's duty must be defined with reference to the experience and intelligence of the person to whom the duty is owed." *Id.* at 413. MacKenzie's past experience was that the Medin corporations often required guarantees on their loans. As stated in *First National Bank of Hopkins v. International Machines Corp.,* 279 Minn. 188, 156 N.W.2d 86 (1968):

> [A]ppellants were knowledgeable businessmen who understood the nature of the obligation which they assumed. As shareholders and directors of the corporation, it may be assumed that they benefited directly from the loan. It cannot be denied that they knew they were to be held responsible in accordance with the terms of the instruments which they signed.

*Id.* at 193, 156 N.W.2d at 88–89.

Here the facts demonstrate that MacKenzie was an officer of a corporation which needed his assistance to obtain a loan. The evidence discloses no reason for the bank to believe MacKenzie was relying on it to advise and counsel him.

■ The *Klein* decision indicated that there are at least two other "special circumstances," in addition to the existence of a fiduciary relationship, where nondisclosure may constitute fraud. In *Sjogren* the court discussed the second "special circumstance" noted in *Klein:* whether nondisclosure may constitute fraud when a bank has superior knowledge of a depositor's actions. The *Sjogren* court indicated that a bank need not disclose the financial condition of a depositor even if it suspects that the depositor is insolvent, and explained:

> [T]he determinative question is whether Richfield Bank, through its loan officer

\* \* \* actually knew that [the depositor] was so irretrievably insolvent that it had no reasonable expectation of fulfilling its obligations under the contract with respondents. If Richfield Bank knew only that [the depositor] was insolvent, as opposed to irretrievably insolvent, it would not have actual knowledge of fraud and thus would not be under a duty to disclose the financial condition of its depositor to respondents.

*Sjogren,* 309 Minn. at 368, 244 N.W.2d at 651. In the present case there are no findings by the court concerning the "irretrievable insolvency" of MCI, but only references to its "precarious financial condition." These findings therefore do not support the conclusion that the appellant bank was under any duty to disclose to MacKenzie the financial condition of MCI.

### II.

The trial court also concluded:

Although funds were periodically available in the various Medin accounts, the Bank took no reasonable steps to repay the loan and satisfy the mortgage on [MacKenzie's] homestead.

Again, the appellant bank argues that it was under no duty to protect MacKenzie's interests, and again we must agree with the bank's position.

■ The loan arrangement between the parties to this action constituted a surety relationship. A surety is a party who is liable to pay a debt but who is entitled, if the debt is enforced against him, to be indemnified by another who ought himself to have paid the debt before the surety was compelled to do so. *Wendlandt v. Sohre,* 37 Minn. 162, 163, 33 N.W. 700, 701 (1887). The law governing surety arrangements indicates that although a creditor must exercise good faith in his dealings, he has no duty to look after the interests of the surety. *Midway National Bank v. Gustafson,* 282 Minn. 73, 79, 165 N.W.2d 218, 223 (1968). It is generally the responsibility of the surety to make sure that the principal obligor performs his duty. *Id.* This rule

has been codified as Minn.Stat. § 540.11 (1982) which states:

An action may be brought against two or more persons for the purpose of compelling one to satisfy a debt due to the other, for which the plaintiff is bound as surety.

This statute embodies former equity practice, *In re Liquidation of Farmers State Bank of North Branch,* 174 Minn. 583, 588, 219 N.W. 916, 918 (1928), and deprives a surety of a cause of action against a creditor for failure to demand payment from the principal obligor. *Huey v. Pinney,* 5 Minn. 310, Gil. 246 (1861).

■ Under the above rules, therefore, it was MacKenzie's duty to pursue his rights against Medin, and the appellant bank was under no responsibility to pursue those rights on behalf of MacKenzie. As one commentator has stated, "the mere passive neglect of the creditor to pursue his legal remedies will not release the surety." 18A Dunnell Minnesota Digest 2d, *Suretyship* § 3.02 (3d ed. 1980). Therefore, even though there were funds available in various Medin accounts which could have been used to pay off the MCI loan, it was the duty of MacKenzie, rather than the appellant bank, to require Medin to use those funds to pay off the loan.

■ MacKenzie argues that when the bank extended the time for payment of the MCI loan several times without his knowledge or consent, he was released from his obligation under the original note. The extension of the time for payment will generally release a surety if the extension is procured without his consent. *Willis v. Davis,* 3 Minn. 17, Gil. 1 (1859). However, the burden is on the surety to plead and prove that the extension was allowed without his consent. *Washington Slate Co. v. Burdick,* 60 Minn. 270, 271, 62 N.W. 285, 286 (1895). A surety may waive a release and allow an extension of the time for payment. *Hooper v. Pike,* 70 Minn. 84, 72 N.W. 829 (1897). In the present situation the bank introduced a security agreement separately signed by MacKenzie and his wife which specifically authorized the bank

to extend the loan agreement "from time to time" without notice to the respondent. MacKenzie's duties were therefore not released when the bank extended the time for payment of the MCI loan.

We recognize that under our decision today the appellant bank will be allowed to foreclose the mortgage on MacKenzie's home. Nonetheless, language found in *Watkins Products, Inc. v. Butterfield,* 274 Minn. 378, 144 N.W.2d 56 (1966) is instructive:

> When two competent parties who can readily read and write, sign a guaranty agreement and the plaintiff on the basis of the guaranty extends credit to the other defendant, there is nothing left for a Court to do but to find a judgment against such guarantors. * * * People who sign documents which are plainly written must expect to be held liable thereon. Otherwise written documents would be entirely worthless and chaos would prevail in our business relations.

*Id.* at 380, 144 N.W.2d at 58.

## DECISION

The trial court erred when it enjoined foreclosure of the appellant bank's mortgage on the respondent's home. The bank had no duty to disclose to the respondent the poor financial condition of MCI nor to satisfy the mortgage even though funds were periodically available in various accounts.

Our reversal of this matter clearly indicates that the appeal by the bank was not frivolous; thus the respondent's claim for attorney's fees is denied.

Reversed.