No. 91-224

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

THOMAS and DENISE BAIRD,

     Plaintiffs and Respondents,

     -vs-

NORWEST BANK,

     Defendant and Appellant.

**FILED**

**DEC 4 - 1992**

*Ed Smith*
**CLERK OF SUPREME COURT**
**STATE OF MONTANA**

APPEAL FROM:  District Court of the First Judicial District,
              In and for the County of Lewis and Clark,
              The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

          Terry B. Cosgrove and Tom K. Hopgood argued, Dale E.
          Reagor, Luxan & Murfitt, Helena, Montana
          Pierre L. Bacheller, Pierre L. Bacheller, Inc.,
          Billings, Montana

     For Respondent:

          Jonathan Motl argued, David K. W. Wilson, Jr.,
          Reynolds, Motl, Sherwood & Wright, Helena, Montana

     For Amicus Curiae:

          George T. Bennett, Attorney at Law, Helena, Montana

Submitted: June 6, 1992

Decided: December 4, 1992

Filed:

_____
        Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

Plaintiffs, Thomas and Denise Baird, brought this action to recover damages from Norwest Bank for accelerating payment and repossessing their truck and van upon a default under an installment note. The complaint sought damages based on breach of contract; breach of the covenant of good faith and fair dealing: breach of the Montana Unfair Trade Practices and Consumer Protection Act; fraud: and intentional infliction of emotional distress. The jury returned a verdict for the Bairds and awarded them $5,200 for violation of the Montana Consumer Protection Act: $6,600 for breach of contract obligations; $27,000 for fraud: and $81,000 in punitive damages. Norwest appeals. We affirm in part and reverse in part.

The issues for our review are:

1. Was there sufficient evidence to support the jury's verdict that Norwest Bank breached the contract?

2. Was there sufficient evidence to support the jury's verdict that Norwest Bank committed fraud?

*3.* Was there sufficient evidence to support the jury's award of emotional distress damages?

4. Did the District Court err in allowing the Bairds' former attorney to testify as an expert witness?

5. Does the Montana Unfair Trade Practices and Consumer Protection Act apply to consumer loans by banks?

6. Did Norwest Bank waive the default provisions of the

installment note by accepting late payments?

7.    Should the Bairds be awarded attorney's fees on appeal?

8.    Did the District Court properly review the punitive damages award?

Plaintiffs, Thomas and Denise Baird, were the owners of a 1975 Dodge van and a 1979 4-wheel drive pickup truck.  In early 1989, the front end of the truck failed and the Bairds borrowed $1,190.77 from Norwest Bank (Norwest) and used the money to fix the front end of the truck.  The truck was put up as a security for the loan. The first payment on this loan was paid on time.

In April 1989, the engine on the truck failed and the Bairds borrowed additional money from Norwest to replace the truck engine. The second loan was for the amount of $2,904.81 and the money was used to repay the first Norwest loan and to purchase the new truck engine.  Both the truck and the van were secured by a note and security agreement with monthly payments set at $140.68 beginning May 24, 1989.

The first payment on the second loan was eleven days late. The second payment was twenty-two days late.  The delinquent account was assigned to a Norwest employee collector named Sarah Mosure (Ms. Mosure). When the third payment, due July 24th, became fifteen days overdue, Ms. Mosure initiated collection procedures on the Bairds' account.  Shortly thereafter, Ms. Mosure telephoned Mr. Baird.

The substance of that phone call was central to the issues decided by the jury.  Ms. Mosure maintained that Mr. Baird and she

3

agreed that the account would be brought up to date by September 1st. The Bairds maintained that Ms. Mosure agreed to give them until September 15th to make the payment. Ms. Mosure entered the September 1st date as the agreed date on the bank computer.

On September 12, **1989,** when no payment had been made, Norwest accelerated the note and repossessed the Bairds' van. Norwest maintained that the Bairds were advised that they could obtain possession of their van by paying the accelerated loan balance. On September **13,** the Bairds attempted to make the July and August payments by depositing a check in the Norwest night deposit. Norwest returned those payments to the Bairds. The Bairds attempted to make timely September, October and November payments but those payments were also rejected by Norwest and were returned to them. On December 12, 1989, the pickup truck was also repossessed without notice to the Bairds.

The Bairds brought this action against Norwest and the case was tried before a jury. The jury returned a verdict for the Bairds, specifically finding that Norwest had breached a contract with the Bairds, committed fraud, and violated the Montana Unfair Trade Practice and Consumer Protection Act of **1973** (CPA). The jury awarded punitive damages. Norwest appeals the denial of its motion for directed verdict, the judgment entered on the jury verdict, and the denial of its motions for judgment NOV and new trial.

I

Was there sufficient evidence to support the jury's verdict that Norwest breached the contract?

The jury was instructed with regard to the breach of contract claim as follows:

INSTRUCTION NO. 11

The issues to be determined by you in this case are these:

. . .

[D]id the Defendant breach its contractual obligations to Plaintiffs. If you find Defendant did not breach the contract, you will not consider the issue further. If, however, you find such a breach occurred you will have a second question to consider, namely:

Was the breach the cause of any damage to Plaintiffs? If your answer to this question was "no" you will not consider the issue further. If your answer is "yes", you will have a third question to consider, namely:

What actual damages arose from breach of the contract: (You may not award damages for emotional distress damages or punitive damages under this theory of recovery. You may not award damages already awarded under the Consumer Protection Act.)

The jury concluded that Norwest breached the contract and awarded damages of $6,600 to the Bairds.

Norwest contends there was a complete failure on the part of the Bairds to prove that Norwest agreed to give the Bairds until September 15th to bring their loan current. Bairds contend that Ms. Mosure had agreed to a payment date of September 15th.

The testimony of both Mr. and Mrs. Baird established that they told Ms. Mosure, the collector for Norwest, that they could make the payment "after the 10th." Repossession took place on September 12. The testimony of Mr. Poston, at one time the attorney for Bairds, supports the Bairds' contention that a September 15th date was agreed to and that Norwest breached the contract.

5

In addition, the testimony of Jean Fangsrud, also of Norwest, established that the Bairds had told her they had promised to pay by September 15:

Q. Can you describe for the jury what contact, if any, you had with either Tom or Denise Baird?

A. The only contact that I had with them was the day after the repossession. I first talked to Denise and then later that day I did talk to Tom in reference to the repossession.

Q. Would you describe for the jury the substance of the conversation that you had with Mrs. Baird?

A. Okay. When Denise did call me, she wanted to know why that Norwest Bank had repossessed the van. I explained to her because there was a broken promise to pay for two payments and then she had also indicated to me that Tom was going to make the two payments. I also told her at that time that Norwest Bank will not accept the two delinquent payments. The loan needed to be paid off in full, plus the expenses that Norwest Bank had incurred.

Q. You informed Denise at that time that the two payments, even if the Bairds were to attempt to make them that day, would not be accepted?

A. Correct.

Q. Did you have any further conversation with Mrs. Baird?

A. I don't believe so.

Q. Would you describe for the jury the conversation you had with Mr. Baird later that day?

A. Mr. Baird had contacted me and also wanted to know why the repossession had taken place. I explained to him what had happened, the broken promise to pay the two payments. He had told me that he did not promise to pay on September 1 of '89. Because we had not received that it

6

was assigned out to take possession.

Q.    However, in reviewing the comments entered by
      Sarah Mosure, do you find information contrary
      to Mr. Baird's assertion--

A.    Yes.

Q.    --that he did not promise to pay on September
      1?

A.    He had told Sarah that he would make payments
      on September 1.  He said that the doctors paid
      by September 1.

. . .

Q.    You also recognize, do you not, that in the
      course of your conversation Mr. Baird was in
      disagreement with Sarah's position that he had
      promised by September 1st?

A.    Yes, he informed me that he did not make a
      promise to pay for two payments on September
      1st.

Q.    He informed you he had promised to pay by
      September 15th?

A.    That's what he informed me.

Q.    And the only information you had that would
      dispute him was what Sarah had typed in?

A.    Yes.

The jury concluded that Norwest breached the contract and assessed

damages for such breach in the amount of *$6,600.*

The standard of review to be applied here was set forth in

Barrett v. ASARCO (1990), 245 Mont. 196, 200, 799 P.2d 1078, 1080;

and Miller v. Frasure (1991), 248 Mont. 132, 137, 809 P.2d 1257,

1261:

> Substantial evidence is that evidence that a
> reasonable mind might accept as adequate to support a
> conclusion; <u>it consists of more than a mere scintilla of
> evidence but may be somewhat less than a preponderance</u>,

7

Black's Law Dictionary **1281** (5th Ed. **1979)**; Stanhope v.
Lawrence (Mont. **1990)**, **[241** Mont. **468]**, **787** P.2d **1226,
1228-1229, 47** St.Rep. **438, 440.** Although it may be based
on weak and conflicting evidence, in order to rise to the
level of substantial evidence it must be greater than
trifling or frivolous. Christensen v. Britton (Mont.
**1990)**, **[(1989), 140** Mont. **393,] 784** P.2d **908, 913, 46**
St.Rep. **2223, 2230.** [Emphasis added.]

Barrett, **245** Mont. **196, 799** P.2d **1078.**

In Hash v. State **(1991), 247** Mont. **497,** 500, **807** P.2d **1363,
1365,** this Court held "[t]his Court cannot reweigh the evidence or disturb the findings of a jury unless that evidence is so inherently impossible or improbable as not to be entitled to belief." All of the parties agree that the payment date by agreement was extended. The contested fact is to what date. Although the Bairds failed to positively testify to an agreement with Norwest for a September 15th payment date, after considering all of the evidence, we conclude there was evidence which a reasonable mind might accept as adequate to support a conclusion of a September 15th payment date. We hold that there was sufficient evidence to support the jury's verdict that Norwest breached the contract.

II

Was there sufficient evidence to support the jury's verdict that Norwest committed fraud?

The jury was instructed on fraud as follows:

If you find that the parties agreed that the late payments were to be made by September 15, **1989,** then you may consider whether the Defendant committed fraud. If you find that the parties agreed that the late payments were to be made by September 1, **1989,** then you may not consider whether the Defendant committed fraud.

8

The jury was further instructed on the nine elements necessary to establish actual fraud. This Court recently described the same elements in Batten v. Watts Cycle and Marine **(1989),** 240 Mont. **113,** 117, **783** P.2d **378, 380-381.** The elements and applicability to this case are:

1. Was there a representation?

The alleged representation in this case was that Norwest represented that it would allow the Bairds until September 15th to make their payment. Because in Issue I the jury found that the parties agreed to the payment date of the 15th, this element is satisfied.

2. Was the representation false?

Again, this element is disposed of under Issue I.

**3.** Was the false representation material?

From the facts it is clear that the payment date of September 15th was material.

4. Did the speaker have knowledge as to the falsity of the representation?

In other words, did Ms. Mosure, the speaker, know that she was falsely representing the agreed upon payment date when she entered September 1st into the computer? **A** review of the record demonstrates the total absence of evidence that Ms. Mosure knew of the falsity of the September 1 date. We therefore must conclude that the Bairds failed to satisfy this element of fraud.

5. Did the speaker intend that the false representation should be acted upon by the person and in the manner reasonably

contemplated?

To restate, did Ms. Mosure, agent of Norwest, <u>intend</u> that the Bairds should act upon the false representation which Ms. Mosure had made as to the September 15th date? There is nothing in the record to demonstrate that Ms. Mosure intended that the Bairds act upon the September 15th date. Even the Bairds' testimony fails to prove this point. Mr. Baird testified he told Ms. Mosure that he needed until after September 10th to make his payment. He did not testify that Ms. Mosure told him he could have until September 15th to make the payment. Ms. Mosure testified that Mr. Baird asked her if he could have until the 10th, but that she agreed to a payment date of the 1st. Even though we have affirmed the jury's verdict under Issue I, that the parties agreed to a payment date of September 15th, there is absolutely no indication in the record that Ms. Mosure intentionally entered the wrong date into the computer.

In proving this element of fraud it is the speaker's intent we are concerned with. That would be Ms. Mosure. It is true that the jury found there was an agreed upon date of September 15th, but the jury was able to consider <u>all</u> of the testimony and evidence and the surrounding circumstances in arriving at that conclusion. In satisfying this particular element of fraud only Ms. Mosure's intent as the speaker may be considered. The record fails to reveal any such intent on Ms. Mosure's part. Furthermore, no one testified that Bairds were intentionally given the wrong date or that Ms. Mosure intentionally entered the wrong date. Not even the

Bairds so testified. In fact, the Bairds only maintain that Ms. Mosure mistakenly entered the wrong date. We conclude that the Bairds have failed to prove this essential element of fraud.

The Bairds failed to prove two of the essential elements required under the instruction in order to establish actual fraud. Therefore, we hold that there was not sufficient evidence to support the jury's verdict that Norwest committed fraud and reverse on this issue.

We note that the jury awarded damages for fraud in the amount of $27,000. Because we reverse on this issue, the District Court shall vacate the damages awarded for fraud in the amount of $27,000.

### III

Was there sufficient evidence to support the jury's award of emotional distress damages?

The only damage award on the verdict form which might be construed to include emotional distress parasitic damages was for fraud. Such award is vacated by Issue II of this opinion. Therefore the issue is moot.

### IV

Did the District Court err in allowing the Bairds' former attorney to testify as an expert witness?

Mr. Poston, the Bairds' first attorney, testified at trial about his involvement with the Bairds and about his contacts with Norwest and its attorney. Norwest maintains that he testified as an expert. It maintains that he testified to his legal opinion on

the law of waiver, self-help repossession without notice, and acceleration of a note. Thus, Norwest maintains that all of these questions eliciting this testimony were improper.

Norwest states that as a general rule, an attorney cannot advise the jury as to the law of the case. Safeco Ins. Co. v. Ellinghouse (1986), 223 Mont, 239, 251, 725 P.2d 217, 224. Norwest maintains that Mr. Poston's testimony pertained to ultimate legal issues in this case--whether Norwest acted fairly in the conduct of commerce under the CPA; whether Norwest had the right to repossess the vehicle absent notice; and whether Norwest had waived its right to accelerate the debt absent notice.

The Bairds urge that the only objection of Norwest's counsel to the testimony of Mr. Poston was:

> I object, your honor. I believe that the offer of an opinion may improperly invade the province of the jury in determining facts in this case. [Emphasis added.]

That objection was overruled and no objection was made that Mr. Poston was testifying to any legal opinions.

In view of the limited objection made by counsel for Norwest, we hold that there was no error in allowing Mr. Poston to testify.

V

Does the Montana Unfair Trade Practices and Consumer Protection Act apply to consumer loans by banks?

The CPA prohibits unfair trade practices by entities engaged in "trade or commerce." "Trade or commerce" is defined as follows:

> (6) "Trade" and "commerce" mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of

12

value, wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state.

Section 30-14-102, MCA.

The first question is whether or not the loaning of money, taking security therefor, and the collection of money, are transactions within the above definition of trade or commerce. This Court has not previously decided this issue. Statutes prohibiting unfair trade practices have been interpreted to be broad in scope and flexible in application so as to respond to human inventiveness. See In re Smith (3rd. Cir. 1989), 866 F.2d 576. The business of mortgage lenders is the sale of a service within the scope of unfair practices acts: see In Re Smith, supra. In the case of Garland v. Mobile Oil Corporation (1972), 340 F.Supp 1095, in which Mobile argued the uniform act does not apply to debtor-creditor relations involving credit card transactions and collections, the court stated as follows:

> Only an artificially narrow construction would hold that the statute applies broadly to practices utilized to effect a sale, but cannot reach the practice utilized in its financing.

Garland at 1099. Here the money loaned was used by the consumer at least in part for repairs and a new engine for a private motor vehicle.

Our statute does not in anyway define or limit the words "any services" as used in § 30-14-102(6), MCA, supra, or as used in § 30-14-133, MCA, which establishes the cause of action asserted here. Section 30-14-133, MCA, so far as pertinent is as follows:

(1) Any person who purchases or leases goods or services

13

primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by **30-14-103** may bring an individual but not a class action under the rules of civil procedure in the district court of the county in which the seller or lessor resides or has his principal place of business or is doing business to recover actual damages or **$200,** whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained and may provide such equitable relief as it considers necessary or proper.

There is no reason why the word "services" as used in § **30-14-102(6),** MCA, be interpreted differently than as used in § **30-14-133,** MCA.

The approach to defining what is meant by the word "services" in the statute should be broad in scope. See In re Smith, supra. This statute being in derogation of the common law, should be liberally construed with a view to effect its object and to promote justice. See § **1-2-103,** MCA, **1991.**

Norwest has cited the case of Riverside National Bank v. Lewis (Tex. 1980), **603** S.W.2d **169,** which held that money (borrowing of money) is neither a **"good"** or a "service" and stated:

Money, as money, is quite obviously neither work nor labor. Seeking to acquire the use of money likewise is not a seeking of work or labor. Rather, it is an attempt to acquire an item of value. We hold that an attempt to borrow money is not an attempt to acquire either work or labor as contemplated in the DTPA.

Riverside at **174.**

However, the Texas statute defined more restrictively what services are under the statute. We note that the Riverside case states that seeking to acquire the use of money is an attempt to acquire an item of value. The Riverside case was later limited to

**14**

its facts which were the extension of credit unrelated to a specific acquisition. Our § 30-14-102, MCA, defines "trade" or "commerce" as the "[s]ale, or distribution of . . . [a] thing of value."

Later Texas cases expanded the Texas Act to include services of a bank in connection with the extension of credit. See Security Bank v. Dalton (Tex.Ct.App. 1991), 803 S.W.2d 443, 452. This conclusion was arrived at even though the Texas Act defined "services" as follows:

(1) "Goods" means tangible chattels or real property purchased or leased for use.

(2) "Services" means work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods. . . .

. . .

(4) (Consumer) means an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business customer that has assets of $25 million or more. . . .

In the case of Pa. Bankers Ass'n v. Com., Bureau of Consumer Protection (1981), 427 A.2d 730, the Commonwealth Court of Pennsylvania held that under the Unfair Trade Practices Act the activity of lending and collecting money is trade or commerce. The court had previously held in Pennsylvania Retailers, etc. v. Lazin (1981), 426 A.2d 712, 718, that lending and collecting money was within the definition of service.

We conclude therefore that the Unfair Trade Practices and Consumer Protection Act applies to consumer loans by banks in the

15

lending and collecting of such loans.

VI

Did Norwest waive the default provisions of the installment note by accepting late payments?

In light of our holding under Issue I, it is not necessary to address this issue.

VII

Should the Bairds be awarded attorney's fees on appeal?

Norwest maintains that upon reversal, the Court should direct the District Court to award Norwest its attorney's fees for both the lower court proceedings and the appeal herein.

The Bairds maintain that the parties stipulated and agreed to the amount of attorney's fees which should be awarded the plaintiffs as prevailing party in the District Court litigation. The Bairds ask this Court to grant them their attorney's fees necessary to defend this appeal with the proper amount to be determined by stipulation of the parties, or if necessary, by the District Court.

The contract involved here provides for attorney's fees to the prevailing party. Section **28-3-704,** MCA, provides that a contractual right to attorney's fees is reciprocal. In addition, the CPA, § **30-14-133,** MCA, allows the "prevailing party'' to recover attorney's fees.

The parties entered a stipulation as to attorney's fees which provides:

> COMES NOW the parties above named through their counsel of record and stipulate and agree that

16

Plaintiffs, as prevailing parties in this matter under the contract and Montana Consumer Protection Act claims, are entitled to the sum of Nineteen Thousand Dollars ($19,000) as their reasonable attorney fees and further agree that the judgment entered herein may be amended nunc pro tunc to allow for the addition of that amount of attorney fees.

This agreement is based on Plaintiffs' status as prevailing party and the amount specified in this agreement has no force and effect should an appeal result in a reversal of Plaintiffs verdict under one or both of the claims giving rise to Plaintiffs rights to attorneys' fees. The amount specified in this agreement applies only to attorney fees incurred through February 15, 1991, the last day of the jury trial in this matter, and does not apply to any attorney fees which may be incurred in post-trial matters, including appeal. The parties agree to deal with all such post-trial attorney fees issues at the appropriate time and before the appropriate court. [Emphasis added.]

Inasmuch as there has been no reversal of the claims under which the prevailing party is entitled to reasonable attorney's fees, the plaintiffs are entitled to their fees to defend this appeal.

VIII

Did the District Court properly review the punitive damages award?

This Court having reversed the verdict on the tort of fraud, the award of punitive damages is to be vacated and the issue is moot. Due to the fact that the award for punitive damages is vacated and was included in the total award by the jury and the District Court having stated in its order on post-trial motions that it was taking the award into consideration in not awarding treble damages for violation of CPA, we hereby remand to the District Court for consideration in its discretion to award treble damages under § 30-14-133(1), MCA, and for such further action as

17

may be necessary in conformance with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

18

Justice William E. Hunt, Sr., concurring in part and dissenting in part.

I concur with the majority's decision regarding Issues I, **IV,** V, and **VI.**

However, I dissent with the majority's decision regarding Issues **11, 111,** and **VIII** because I believe it disturbs the jury's fact-finding process. This Court has continuously upheld the fundamental proposition that the jury is entrusted with the responsibility of seeking the truth. Because of our high regard for the jury deliberation process, we have established an exacting standard of review when examining a jury's verdict.

> Motions to set aside jury verdicts as not supported by the evidence are proper only when there is a complete absence of any credible evidence in support of the verdict. All evidence and all inferences drawn therefrom must be considered in a light most favorable to the adverse party. The courts will exercise the greatest self-restraint in interfering with the constitutionally mandated processes of jury decision.

Lackey v. Wilson **(1983),** *205* Mont. **476, 479,** 668 P.2d **1051, 1053** (quoting Barmeyer v. Montana Power Co. **(1983),** 202 Mont. **185, 191, 657** P.2d **594, 597).**

Evidence of fraud, by its very nature, will often be circumstantial. On numerous occasions, trivial, remote, and disconnected facts will be tied together by a jury to support a finding of fraud. Walker v. Mink **(1945), 117** Mont. **351, 158** P.2d **630.** When analyzing Instruction No. **19,** the court indicated that the jury could only consider whether the bank committed fraud if they first found that the parties agreed that the late payments

**19**

were due by September 15. After hearing much conflicting evidence, the jury concluded that the parties agreed the payments were due on September 15. With this finding, there was an implicit agreement by the bank not to repossess the vehicle prior to the agreed date of payment. However, the bank proceeded to repossess the vehicle within only a few days of making that agreement. In addition, it would not be difficult to infer from the facts that the time and working pressures of Ms. Mosure's job forced her to type September 1 into the bank's computer in order to clear her responsibility for collection of the Baird's delinquent account. It is from the facts above that I believe there was substantial evidence to support the jury's verdict.

Therefore, I would affirm the decision of the District Court and uphold the entire jury verdict.

<u>William E. Hunt</u>
Justice

Justice Terry N. Trieweiler concurs in the foregoing concurrence and dissent.

<u>Terry Trieweiler</u>
Justice

Justice Fred J. Weber concurs and dissents as follows:

I dissent from the holding of the majority opinion on Issue **V** - Does the Montana Unfair Trade Practices and Consumer Protection Act (MCPA) apply **to** consumer loans by banks? I concur in the balance of the holdings of the majority opinion.

The majority concludes that the MCPA applies to consumer loans by banks in the lending and collecting of such loans. I will first summarize my reasons for disagreeing with that conclusion. The primary question is whether a bank consumer loan falls within the provisions of § **30-14-133,** MCA, which applies to any person who purchases or leases goods or services primarily for personal, family, or household purposes. The majority has failed to demonstrate how the borrowing of money by a consumer is the purchasing or leasing of goods or services.

Before discussing the specific statutory sections with which we are directly involved, I think it appropriate to make a few comments about the MCPA. That Act was adopted in **1973** with the aim of prohibiting unfair trade practices with provisions for investigation of such practices and penalties for violations. Title 30, Chapter **14,** Parts **1-2.** The Act has forty-two different sections which describe the means of protecting the consumer by action on the part of the Department of Commerce, the Attorney General, and the county attorneys of the fifty-six counties. These sections provide for injunctions, restraining orders, civil penalties up to **$10,000,** possible criminal convictions and criminal fines with imprisonment. The basic thrust of the Act is protection

21

of the consumer by enforcement through various governmental agencies.

Before discussing **the** one specific code section in that Act which applies to the consumer, **I** emphasize the apparent result of the majority opinion.  In view of the broad definition of "services" in the majority opinion, I assume that the majority would apply the Act to the following:  1) all activities of any kind of banks and loaning institutions, including all aspects of loan and mortgage and other security financing; 2) all types **of** services by hospitals, nursing homes, and retirement homes; *3)* all types of services rendered by such people as medical doctors, dentists, accountants, architects, attorneys, and engineers.  The list is almost unlimited in those "services" which might be included.  Why is it important to consider such "services?"  The answer is the treble damages and attorney fees provisions of § 30-14-133, **MCA,** which are as follows:

> **(1) . . .** The court may, in its discretion, award up to three times the actual damages sustained and may provide such equitable relief as it considers necessary or proper.
> **. . .**
> *(3)*  In any action brought under this section, the court may award the prevailing party reasonable attorney fees incurred in prosecuting or defending the action.

In the past, very few actions have been brought by consumers under the Act.  Because of the great benefit of both treble damages and attorney fees, I suggest that those having claims against any of the above listed parties will conclude that the best procedure is to seek to come under the Act.  I conclude that such a striking

change in the practice in Montana should be left to the legislature.

I will not discuss the particular sections of the Act which are directly pertinent. The key consumer section is § **30-14-133, MCA**, which provides in pertinent part:

> Damages--notice **to** public agencies--attorney fees--prior judgment **as** evidence. **(1)** Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money . . . as a result of the use . . . by another person of a method, act, or practice declared unlawful by **30-14-103** may bring an individual . . . action . . . in the district court of the county in which the seller or lessor resides . . .

This section applies to any person who purchases or leases goods or services primarily for personal, family, or household purposes. Clearly the making of a consumer loan from a bank does not constitute a purchase or lease of goods nor a lease of services. The remaining question is whether a consumer making a bank loan has made a purchase of services. As pointed out in the majority opinion, this issue has not been considered in Montana and very few other jurisdictions have considered the issue.

The majority relies upon Smith v. Commercial Banking Corp. (3rd.Cir. 1989), 866 F.2d 576, which involves the Pennsylvania consumer protection statutes. Smith points out that section 2 of the Pennsylvania act enumerates seventeen specific acts which constitute unfair or deceptive acts or practices and then points out that Smith contends that Fidelity's conduct falls within the catch-all provisions which make unlawful engaging in any other fraudulent conduct which creates a likelihood of confusion **or**

misunderstanding.  See 73 Pa.Stat.Ann. § 201-3 (Purdon Supp. 1992) We have no specific act provisions of that nature in our MCPA.  The only definitional statute regarding unfair acts is § 30-14-103, MCA, which provides:

> **Unlawful practices.**  Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

I do not find it appropriate to so generalize in accepting Pennsylvania cases, federal and state, as authority where the central provisions of the act are so strikingly different.

The majority points out that in Riverside Nat'l Bank v. Lewis (Tex. 1980), 603 S.W.2d 169, the Texas court concluded that the borrowing of money was neither a "good" or a "service" (both of which are used in § 30-14-133, MCA), and  stated:

> Money, as money, is quite obviously neither work nor labor.  Seeking to acquire the use of money likewise is not a seeking of work or labor. Rather, it is an attempt to acquire an item of value.  We hold that an attempt to borrow money is not an attempt to acquire either work or labor as contemplated in the DTPA.

Riverside, 603 S.W.2d at 174.  The majority concludes that the Texas statutes define more restrictively than ours.  It also points out that Riverside was limited to its facts.  I would point out that the above quote has nothing to do with the statute but does constitute an intelligent analysis of the nature of goods and services as compared to money and seeking to acquire the use of money.  This analysis does contradict the holding of the majority.

Ultimately the majority refers to 1981 Pennsylvania cases which held that lending and collecting money was within the definition of service and then proceeds to conclude that our

24

Montana Act and its definition of services applies to consumer loans by banks, I strongly disagree with that conclusion.

In analyzing whether there has been a purchase of services where the bank makes a consumer loan, I point out § 30-14-133, MCA, provides that the action is to be brought in the district court of the county in which the "seller or lessor" resides. Under common usage, I do not believe that the term seller or lessor would be considered as including a bank which makes consumer loans.

Before attempting to reach a conclusion regarding the extent of the purchase or leasing of goods and services as defined in § 30-14-133, MCA, we should also consider that under such section, a consumer is entitled to recover against another person who uses a method, act, or practice which is declared unlawful under § 30-14-103, MCA, quoted above. In order to determine what trade and commerce are meant to be under § 30-14-133, MCA, we must consider § 30-14-102, MCA, which contains the following definition:

> *(6)* "Trade" and "commerce" mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, persona, or mixed, and any other article, commodity, or thing of value, wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state.

From the statutory wording it is clear that unfair methods of competition and unfair or deceptive acts are limited to those involved in the conduct of "trade" and "commerce" as defined in § 30-14-102, MCA. This requires our consideration of that section in greater detail.

Section 30-14-102(6), MCA, defines trade and commerce as advertising, offering for sale, sale and distribution of services and property. On its face, the making **of** a consumer loan by a bank does not fit within the classification of advertising, offering **for** sale, sale, or distribution of services or other property. Because there is no clear stated intent to include bank loans or consumer loans or bank or consumer activities, **I** think it essential to consider the history of the MCPA during the approximate **20** years since it was enacted.

Since **1973** there has been no legislative revision indicating a specific intent that a bank loan should constitute a purchase of services within the definition of the MCPA. That conclusion is fortified by a consideration of the regulations adopted during this 20-year period by the Department of Commerce of Montana. These regulations are set forth in **8.78.101-406,** ARM. A number of these regulations specifically refer to various aspects of the sale of merchandise, including its advertising and representations with regard to the same. Next, there are a number of regulations which apply to motor vehicles and cover the sales, repairs, maintenance and service of motor vehicles. These regulations are limited to the services in connection with the sales, repairs and maintenance of such vehicles. There are also regulations covering reporting agencies and fees which are not directly applicable. **A** review of these Rules establishes that the enforcement on the part of the Department of Commerce has been quite limited. Clearly the Department has not concluded that the making of a consumer bank

loan constitutes services under the MCPA, nor have they established any other regulations demonstrating that similar services are considered as coming under the MCPA.

As I again examine the definition of trade and commerce in § 30-14-102(6), MCA, I would follow the lead of the Department of Commerce and limit the interpretation of the sale of services to services relating to property, tangible or intangible, real, personal or mixed, and other articles and commodities in commerce. If that approach is applied to § 30-14-102(6), MCA, then the same approach properly would be applicable to § 30-14-133, MCA. We properly could conclude that under § 30-14-133, MCA, the borrowing of money from a bank on a consumer loan is not a purchase of goods or services. That conclusion is consistent with the reference to "seller" or "lessor" in the code section. In view of the history of the past twenty years, and the potential impact of the majority conclusion, I would leave to the legislature the determination of whether or not it is appropriate to extend the MCPA to consumer loans made by banks and to other types of services rendered within the state.

I would conclude that the MCPA does not apply to consumer loans by banks.

Justice

December 4, 1992

CERTIFICATE OF SERVICE

I hereby certify that the following order **was** sent by United States mail, prepaid, to the following named:

Tom K. Hopgood
Luxan & Murfitt
P.O. Box 1144
Helena, MT 59624

Terry B. Cosgrove
Attorney at Law
208 N. Montana, Ste. 204
Helena, MT 59601

Pierre L. Bacheller
Attorney at Law
P.O. Box 2078
Billings, MT 59103

Jonathan Motl
Reynolds, Motl, Sherwood & Wright
405 No. Last Chance Gulch
Helena, MT 59601

George T. Bennett
Attorney at Law
P.O. Box 1705
Helena, MT 59624

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy