Henry F. BOUBELIK, et
al., Respondents,

v.

LIBERTY STATE BANK, Appellant.

No. C3–94–1136.

Court of Appeals of Minnesota.

Feb. 14, 1995.

Review Granted April 27, 1995.

William D. Turkula, Brenner & Glassman,
Ltd., Minneapolis, for appellant.

Steven S. Hoge, Arnold & McDowell, Min-
neapolis, for respondents.

Considered and decided by AMUNDSON, P.J., and LANSING and KLAPHAKE, JJ.

## OPINION

KLAPHAKE, Judge.

Appellant Liberty State Bank (Liberty) seeks review of a judgment entered based on a jury verdict. Liberty argues that the trial court committed reversible error by providing contradictory jury instructions, refusing to grant Liberty's proposed jury instructions, and rejecting Liberty's motion for judgment notwithstanding the verdict. Respondents Henry F. Boubelik and William B. Baker filed a notice of review alleging that the trial court erred in dismissing their claim under the Minnesota Consumer Fraud Act (the Act). We affirm the jury verdict, but reverse the dismissal of respondents' claim under the Act, and remand for a determination of attorney fees and costs under the Act.

## FACTS

Between 1987 and 1989, Joseph Baker (Baker) borrowed over $350,000 from Liberty on behalf of two business ventures. John Wittek represented Liberty throughout all the negotiations with Baker. Beginning in early 1990, Liberty began to suspect that Baker would be unable to repay his loans. Wittek testified that as a result, he pressured Baker into refinancing his home.

At about the same time, Baker initiated conversations with respondents William B. Baker and Henry F. Boubelik to persuade them to invest in his two business ventures. Baker told respondents that they needed $75,000 to become involved with the ventures. This figure represented another debt Baker owed to Norwest Bank, which had a security interest in the equipment used by one of the business ventures. When respondents expressed concern about their liquidity, Baker informed them that he had a relationship with Liberty and further suggested that respondents obtain a line of credit from Liberty.

Respondents dealt directly with Wittek at Liberty. Wittek told respondents about the risk of entering the restaurant business, but did not mention his concerns about Baker's financial condition. After a few meetings between the parties, Baker personally requested that Wittek grant the loan. Baker testified that Wittek agreed to grant the loan on condition that Baker use the proceeds to pay some of his outstanding debt with Liberty, including an unsecured loan.

On April 12, 1990, Liberty, through Wittek, loaned respondents $75,000 and received shares of common stock in Baker's business and the pledge of certain limited partnership units as collateral. Respondents immediately endorsed Liberty's cashier's check to Baker. Respondents also guaranteed Baker's debt to Norwest Bank after Baker assured them that he would repay half of the debt immediately.

On the same day, Baker used half of the $75,000 to pay off the remaining principal and interest due on one of his loans from Liberty. Within eighteen months, Baker's business ventures failed and he declared bankruptcy. Respondents defaulted on their loan payments to Liberty, and Liberty commenced a foreclosure action on the common stock respondents had pledged as security.

Meanwhile, Norwest Banks initiated a suit against respondents on respondents' guarantee. When respondents learned that Norwest Bank had subordinated its interest in the equipment to Liberty, they settled Norwest's claim against them for $25,000.

Respondents brought this action against Liberty, alleging fraud in connection with the $75,000 loan. After a full trial, a jury found for respondents and awarded them $123,-431.83 in damages.

## ANALYSIS

### I.

Liberty alleges that the trial court erred in submitting contradictory jury instructions. The general jury instruction stated:

> If the bank had actual knowledge of material facts about fraudulent activities of Joseph Baker, then the bank had a duty to disclose those facts to the investors before the bank engaged in loaning them money.

Liberty alleges that the language requiring "actual knowledge" was contradicted by spe-

cial verdict question two which stated: "Did Liberty State Bank know *or have reason to know* about the fraud committed by Joseph Baker upon Henry F. Boubelik and William B. Baker?" (Emphasis added.)

 Trial courts are afforded broad discretion in determining the language of jury instructions. *State Farm Fire & Casualty Co. v. Short,* 459 N.W.2d 111, 113 (Minn. 1990). Nonetheless, "[i]t is reversible error for a judge to give inconsistent and contradictory instructions on a material issue." *Dalager v. Montgomery Ward & Co.,* 350 N.W.2d 391, 395 (Minn.App.1984). In examining jury instructions for error, this court must view the instructions as a whole. *Malik v. Johnson,* 300 Minn. 252, 259, 219 N.W.2d 631, 636 (1974).

 We agree with Liberty that Minnesota courts hold a bank liable for its failure to disclose the poor financial condition of one of its depositors if "the bank had *actual knowledge* of the fraudulent activities of one of its depositors." *Richfield Bank & Trust Co. v. Sjogren,* 309 Minn. 362, 369, 244 N.W.2d 648, 652 (1976) (emphasis in original). The jury in this case was properly instructed that the bank could be liable if it knew or had actual knowledge of Baker's fraud. The failure to define the "have reason to know" language of special verdict question two does not constitute reversible error. "[W]hen read as a whole, [the instructions] were not unduly confusing and misleading." *Dalager,* 350 N.W.2d at 395.

Next, we examine the special verdict form to discern whether the form prejudiced Liberty. We note that although special verdict question two made reference to both the "actual knowledge" and the "had reason to know" standards, special verdict question three explicitly referred to the "bank's knowledge." Again, when read as a whole,

the special verdict form was neither unduly confusing nor misleading. *Id.* Moreover, because the two standards are not facially contradictory and the trial court included the "actual knowledge" standard in its instructions and special verdict form, we hold that any error in the jury instructions was not fundamental. *See id. But see Janke v. Duluth & N.E. R.R.,* 489 N.W.2d 545, 549 (Minn.App.1992) (reversing verdict because jury instructed to reduce plaintiff's damages by amount of contributory negligence, while special verdict form instructed jury to ignore any contributory negligence), *pet. for rev. denied* (Minn. Oct. 28, 1992).

 Finally, the trial court read its proposed jury instructions to Liberty's counsel before reading the instructions to the jury. Liberty's counsel failed to object. In fact, when queried by the trial judge as to the adequacy of the instructions, the record reflects that Liberty's counsel indicated "we've reviewed them and they're satisfactory." As this court has noted before, "[u]nder these circumstances, the failure to object was not excusable." *Palatine Nat'l Bank v. Olson,* 366 N.W.2d 726, 731 (Minn.App.1985).[1]

## II.

Liberty challenges the propriety of the jury verdict. In general,

[a] jury verdict will not be set aside unless it is "manifestly and palpably contrary to the evidence viewed as a whole and in the light most favorable to the verdict." The verdict will be sustained if it is possible to do so on any reasonable theory of the evidence.

*Roemer v. Martin,* 440 N.W.2d 122, 124 (Minn.1989) (citations omitted). To warrant reversal, the evidence contradicting a jury verdict must be "practically conclusive."

---

1. Liberty argues that its submission of proposed jury instructions served as an implicit standing objection. We disagree. First, even if we were to accept Liberty's contention, Liberty's requested instruction fails to specifically identify Liberty's objection and the grounds for the objection. *See* Minn.R.Civ.P. 51 ("No party may assign as error unintentional misstatements and verbal errors or omissions in the charge, unless that party objects thereto before the jury retires to consider its verdict, stating specifically the matter to which that party objects and the ground of the objections."). Second, Liberty's counsel explicitly assented to the jury instructions before they were read to the jury, thereby affirmatively waiving any objection. *See Seidl v. Trollhaugen, Inc.,* 305 Minn. 506, 510, 232 N.W.2d 236, 241 (1975) (declining court's offer to provide curative instruction constituted waiver).

*Ouellette by Ouellette v. Subak,* 391 N.W.2d 810, 817 (Minn.1986).

■ The evidence in this case supports the jury verdict in two ways. First, the jury could reasonably have determined that Wittek actually knew about Baker's dire financial condition, given Wittek's own testimony that he pressured Baker into refinancing his home. Such a determination is further supported by Baker's testimony that Wittek only agreed to approve a loan to respondents on condition that Baker apply a portion of the proceeds to pay off some of his unsecured debt to Liberty. Second, the evidence reflects that Liberty was able to persuade Norwest Bank to subordinate its interest in Baker's restaurant equipment only after respondents guaranteed the Norwest Bank loan. The jury could have reasonably found that Liberty's failure to divulge its interest in the equipment between the time of the subordination agreement and the loan between the parties constituted a fraud upon respondents. Because the jury's verdict has a basis in the evidence, we will not set it aside.

### III.

In their initial complaint, respondents alleged that Liberty's conduct violated the Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69 (1992) (the Act). The district court ruled as a matter of law that respondents did not have a cause of action for consumer fraud. Respondents filed a notice of review, and argue that the trial court's interpretation of the Act was erroneous.[2]

■ The construction and application of statutory language to established facts is a question of law for a reviewing court. *See Meister v. Western Nat'l Mut. Ins. Co.,* 479 N.W.2d 372, 376 (Minn.1992). As a result, this court's review is de novo. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

■■ The Act is remedial in nature and should be "liberally construed in favor of protecting consumers." *State v. Alpine Air Prods., Inc.,* 490 N.W.2d 888, 892 (Minn.App. 1992), *aff'd* 500 N.W.2d 788 (Minn.1993). Recovery under the Act is not limited to unsophisticated, individual consumers. *Church of the Nativity of Our Lord v. WatPro, Inc.,* 491 N.W.2d 1, 7–8 (Minn.1992). The scope of the Act is broader than that of common law fraud. *LeSage v. Norwest Bank Calhoun–Isles,* 409 N.W.2d 536, 539 (Minn.App.1987).

■ The Act prohibits:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with *the sale of any merchandise* [.]

Minn.Stat. § 325F.69, subd. 1 (1992) (emphasis added). The term "merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, or services." *Id.* § 325F.68, subd. 2. Because we have determined that the jury reasonably found that Liberty committed fraud, the sole issue is whether the loan in this case is a "sale of an object, ware, good, commodity, intangible, real estate, or service."

Other jurisdictions have addressed the issue of whether a loan is a "service." Pennsylvania and Montana consumer fraud acts have been construed to encompass loans within the meaning of services. *In re Smith,* 866 F.2d 576 (3d Cir.1989) (Pennsylvania law); *Baird v. Norwest Bank,* 255 Mont. 317, 843 P.2d 327 (1992). The Colorado Court of Appeals has expressed its willingness to consider loans within the definition of "services." *Nienke v. Naiman Group, Ltd.,* 857 P.2d 446 (Colo.Ct.App.1992), *cert. denied* (Colo. Aug. 30, 1993).[3] The Supreme Court of Texas, however, explicitly excluded the grant of loans from its consumer fraud act. *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169

---

**2.** Respondents' claim under the Act is relevant because the Act, unlike common-law fraud, allows the injured party to recover the costs of investigation and attorney fees. *Church of the Nativity of Our Lord v. WatPro, Inc.,* 491 N.W.2d 1, 8 (Minn.1992) (citing Minn.Stat. § 8.31, subd. 3a).

**3.** Although *Nienke* only dealt with the issue of whether a law firm's argument that the Colorado Consumer Protection Act should be extended to include loans was frivolous, the court discussed the issue of whether a loan was a "service." *Id.,* 857 P.2d at 450.

(Tex.1980). Policy considerations lead us to join the majority in finding that loans are "services" within the meaning of Minnesota's Act.

First, we afford our Act a liberal construction. *Alpine Air Prods.,* 490 N.W.2d at 892. The onus is on the legislature to exclude, rather than include, loans from within the protection of the Act. *See Nienke,* 857 P.2d at 450 (noting the Colorado Consumer Protection Act's "broad legislative purpose to provide prompt, economical, and readily available remedies against consumer fraud").

Second, for all practical purposes, a loan constitutes the sale of money. *See Baird,* 843 P.2d at 333 ("[t]he business of mortgage lenders is the sale of a service"). Both the bank and the borrower realize that the borrower is not only expected to repay the bank the future value of the money borrowed, but also closing costs or a use fee for the bank's lending services. Because loans involve an exchange, one who approaches a bank for a loan, like any consumer, "may reasonably expect that he or she will receive fair * * * treatment * * * and that no undue advantage will be taken by the lender." *Smith,* 866 F.2d at 584.

Finally, we find no merit in the Texas Supreme Court's rationale in *Lewis* for rejecting the application of the Texas Deceptive Trade Practices Act (DPTA) to loans. The court emphasized that the borrower merely sought to acquire the use of money by a promise of future payment. *Lewis,* 603 S.W.2d at 175. We find the court's analysis overly restrictive. *See Garland v. Mobil Oil Corp.,* 340 F.Supp. 1095, 1099 (N.D.Ill.1972) ("Only an artificially narrow construction would hold that the statute applies broadly to practices utilized to effect a sale, but cannot reach the practices utilized in its financing."). Moreover, we note that Texas courts have since limited *Lewis* to its facts. *See Megason v. Red River Employees Fed. Credit Union,* 868 S.W.2d 871, 872 (Tex.Ct.App. 1993) (citing cases in which *Lewis* has been limited to transactions where borrower seeks only extension of credit, and not purchase or lease of good or service).

## DECISION

Both the jury instructions and the special verdict form, when read as a whole, were proper. The evidence supports the jury verdict and the trial court did not err in refusing to grant Liberty's motion for judgment not withstanding the verdict. Finally, we hold that the Minnesota Consumer Fraud Act includes loans within its ambit, and remand to the trial court for a determination and award of attorney fees and costs.

**Affirmed in part, reversed in part and remanded.**