Henry F. BOUBELIK, et
al., Respondents,

v.

LIBERTY STATE BANK,
Petitioner, Appellant.

No. C3–94–1136.

Supreme Court of Minnesota.

Aug. 29, 1996.

Rehearing Denied Oct. 10, 1996.

Brenner & Glassman, Ltd., Louis W. Brenner, Sr., Michael J. Orme, Minneapolis, for Appellant.

Jacobson, Harwood, Bennett & Erickson, P.A., Steven S. Hoge, Minneapolis, for Respondents.

John S. Jackson, Vice President and General Counsel, Michael P. Carlson, Associate Counsel, Minneapolis, for MN Bankers Ass'n.

Hubert H. Humphrey, III, Attorney General, James P. Jacobson, Assistant Attorney General, St. Paul, for State of Minnesota.

Smith & Tollefson, Stephen J. Smith, Mark J. Rohrick, Owatonna, for MN Trial Lawyers Ass'n.

## OPINION

ANDERSON, Justice.

Plaintiffs William Baker and Henry Boubelik obtained a loan from Liberty State Bank for the purpose of investing in Lindsay's Bar, a bar and restaurant to be owned and operated by Joseph Baker, William's brother. Plaintiffs' loan from Liberty was secured by collateral pledged by plaintiffs and equipment to be used for Lindsay's Bar. Lindsay's Bar never opened. Joseph Baker, who was both a business and personal customer of Liberty, defaulted on his obligations to Liberty and filed for bankruptcy protection. Plaintiffs defaulted on their loan obligations and Liberty sought to sell stock pledged as collateral. Plaintiffs sued Liberty, seeking to enjoin the sale of the stock and to recover damages on the grounds that Liberty had actual knowledge of Joseph Baker's fraudulent activities and therefore had a duty to disclose those fraudulent activities to plaintiffs. Plaintiffs also alleged that the loan of money by Liberty was governed by the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68–.70 (1994), and that Liberty had violated the Act.

The district court ruled that as a matter of law the Consumer Fraud Act did not apply to

the plaintiffs' loan. The jury found that Joseph Baker committed fraud on the plaintiffs, that Liberty knew or had reason to know of the fraud, that Liberty failed to inform plaintiffs of the fraud, and that plaintiffs were damaged in the amount of $123,431.83. Liberty appealed, and the Minnesota Court of Appeals affirmed the jury verdict, but reversed the district court, holding that bank loans fall within the ambit of the Consumer Fraud Act. *Boubelik v. Liberty State Bank,* 527 N.W.2d 589, 593 (Minn.App.1995). We reverse.

Plaintiff Henry Boubelik was employed by National Car Rental for over 25 years, and in 1990 was its senior vice president of sales and marketing, a position he held until early 1992. While Boubelik was at National, he became acquainted with plaintiff William Baker when Baker began working for him in 1987. Baker is an attorney who, prior to his employment by National Car Rental, worked for a Minneapolis law firm. In early 1990, Boubelik and William Baker were seeking ways to diversify their respective investments. At that time, William Baker's brother Joseph was involved in the ownership of restaurants and nightclubs in the Minneapolis area, including establishments known as the Uptown Bar, William's Pub, and Champps. Joseph Baker suggested to his brother William that plaintiffs invest in his newest venture, a bar and restaurant called Lindsay's Bar.

In order for plaintiffs to invest in Lindsay's Bar, they needed to arrange financing. Joseph Baker suggested that plaintiffs contact John Wittek, a loan officer at Liberty State Bank. In January 1990, William Baker wrote to Wittek seeking to begin discussions about a loan. Between January and the April 12 loan closing, Wittek met separately with Joseph Baker and William Baker on a number of occasions to discuss the financing for Lindsay's Bar. Wittek met with Boubelik on at least one occasion, April 3, 1990.

To understand plaintiffs' action against Liberty, it is necessary to know the nature and extent of Joseph Baker's dealings with both Liberty and Norwest Bank. Since 1987, Joseph Baker conducted both his business and his personal banking with Liberty,

and most of his business dealings at Liberty were with Wittek. As of January 1990, Joseph Baker had a $150,000 line of credit at Liberty for a venture called Old Library Restaurants. At that time, Liberty was concerned that no payment of principal had been made on this line of credit for over one year. In May 1990, Joseph Baker refinanced his home to pay down the Old Library Restaurants' line of credit by $50,000.

In February 1990, Joseph Baker formed Apopka Corporation for the purpose of acquiring and holding the assets of Lindsay's Bar. In March 1990, Liberty extended a $250,000 line of credit to Apopka for Lindsay's Bar and another bar known as William's Pub. This line of credit was secured by accounts receivable, inventory and equipment, the personal guaranty of Joseph Baker, and the personal guaranty of William and Joseph Baker's uncle. On March 9, 1990, $18,900.68 from Apopka's line of credit was used to pay Old Library Restaurants' overdrafts at Liberty. Joseph Baker also had an outstanding loan of approximately $70,000 with Norwest, which loan was secured by equipment to be used for Lindsay's Bar. On March 13, 1990, $35,000 of the Apopka line of credit was used to pay down Joseph Baker's debt to Norwest. After plaintiffs' loan with Liberty was closed, Liberty continued to advance funds to Apopka. In June and July 1990, Liberty made six additional advances to Apopka in the total amount of $60,422.78.

The financing plan proposed by Joseph Baker to the plaintiffs for Lindsay's Bar included Apopka's $250,000 line of credit at Liberty; the equipment on Lindsay's premises, in which Norwest then held a security interest; a $50,000 line of credit at Norwest; and an additional sum of $50,000–$75,000 to be invested by plaintiffs. William Baker testified that plaintiffs were comfortable with personally guaranteeing the Norwest loan if they could get control of the Lindsay's Bar equipment. Joseph Baker told William Baker that Apopka owned the equipment, that Norwest had a security interest in the equipment, and that it was necessary to pay Norwest $35,000 in order for Norwest to subordinate its security interest in the equipment to Liberty's security interest. Plaintiffs tes-

tified that they believed that the $35,000 to be paid to Norwest would be paid from Joseph Baker's personal funds. William Baker admitted that he did not ask Joseph Baker how Joseph Baker was going to obtain the funds to pay Norwest. As previously noted, Joseph Baker used $35,000 from Apopka's line of credit at Liberty, rather than his own funds, to make the payment to Norwest. Believing that the equipment would be available to secure Norwest's loan, plaintiffs agreed to personally guarantee the Norwest debt, and did so on March 8, 1990.[1]

Plaintiffs originally planned to obtain a $100,000 loan from Liberty and were to pay interest quarterly, with a $20,000 principal payment due every year for five years, beginning with the year after the loan was made. As collateral for the loan, Boubelik provided 1,333 shares of Household International, Inc. common stock and William Baker pledged his interest in two real estate limited partnerships.

On April 11, 1990, plaintiffs signed a "Declaration of Loan Purpose," which included the statement that the loan funds are for "general business investment purposes." On the same date, Wittek made a note in the bank file that the purpose of the loan "was to enter in various restaurant operations with William Baker's brother who has the expertise in this area." Wittek testified that he knew that plaintiffs wanted the loan proceeds to be used for working capital for the Lindsay's Bar and William's Pub ventures. Wittek also testified that he knew that Joseph Baker planned to use some of the funds from the loan to cover Old Library Restaurants' overdrafts and to pay off the promissory note of Old Library Restaurants. Wittek did not tell plaintiffs that the funds were going to be used in this way. Wittek also did not tell plaintiffs that Norwest had subordinated its security interest in the Lindsay's Bar equipment to Liberty's security interest in the equipment.

Prior to closing the loan, plaintiffs made no investigation of Joseph Baker's business ventures or financial condition. Plaintiffs did not ask to see Joseph Baker's books, tax returns, or financial statements, talk to his accountant, obtain a credit report or other credit references, or ask whether any amount had already been drawn on Apopka's $250,000 line of credit at Liberty. Boubelik testified that he assumed that William Baker was knowledgeable about Joseph Baker's businesses. Joseph Baker later admitted that during the loan discussions his financial condition was poor. He also admitted that he did not disclose his financial condition to plaintiffs, nor did he disclose his agreement to attempt to use part of the loan proceeds to "pay current" some of his debt at Liberty.

The loan was closed on April 12, 1990. Because William Baker's collateral was not immediately available to secure the loan, only $75,000 of the proposed $100,000 was disbursed at closing. There was no written agreement among Joseph Baker and plaintiffs as to how the $75,000 loan proceeds were to be spent, and no note was signed by Joseph Baker to plaintiffs. Plaintiffs never asked Joseph Baker how he was going to spend the money. When asked about the lack of documentation regarding the $75,000 given to Joseph Baker, Boubelik testified that "[t]here were understandings. I mean, it wasn't—we had discussed what we were going to do. I mean, I think we all knew what was going to happen, how we were going to go about opening Lindsay's and getting it under operation." Joseph Baker used the $75,000 loan proceeds to: (1) deposit $10,000 in Old Library Restaurants' checking account to pay overdrafts, (2) pay $27,126 to Liberty to pay off an Old Library Restaurants' note, and (3) obtain cashier checks payable to himself in the amounts of $30,874 and $7,000.

Lindsay's Bar never opened. Because no revenue was generated by Lindsay's Bar,

1. The equipment was eventually assigned to William Baker as part of a settlement agreement between Baker and Norwest on June 11, 1991. William Baker claimed that at the time of the assignment, he did not know that Liberty already had a security interest in the equipment, even though Liberty had filed a UCC–1 financing statement. Baker claimed he did not learn of Liberty's interest until February of 1992. As of the time of the trial in this case, Liberty had been unable to obtain title to the equipment to sell it. The record indicates that the equipment disappeared and may have been stolen.

plaintiffs were unable to make the first annual principal payment on the loan. In May 1991, plaintiffs negotiated with Wittek for additional time to make the payment and Liberty did extend the first principal payment for an additional year. Joseph Baker filed for bankruptcy protection in September 1991. Plaintiffs subsequently defaulted on their obligation under the loan agreement, and Liberty sought to sell the stock which Boubelik had pledged as collateral. Plaintiffs sued Liberty seeking to enjoin the sale of the stock and to recover damages on the grounds that Liberty had actual knowledge of Joseph Baker's fraudulent activities. The stock was sold before plaintiffs could obtain an injunction. The sale of the stock generated proceeds of $86,478.38, with brokerage fees of $668.11. Liberty then applied $82,038.53 to pay off the loan plus accrued interest. Liberty continued to hold the balance of the proceeds from the stock sale, as well as the collateral provided by William Baker.

Plaintiffs sued Liberty and alleged in their complaint that Liberty breached its duty by failing to disclose to them four material facts: (1) that Joseph Baker planned to use approximately $40,000 of the loan proceeds to pay other obligations he owed to Liberty; (2) that $35,000 had been drawn on Apopka's $250,000 line of credit to repay Norwest; (3) that Liberty persuaded Norwest to subordinate its security interest in the Lindsay's Bar equipment to Liberty's security interest in the equipment; and (4) that there were significant overdrafts on the Old Library Restaurants account and that Joseph Baker and his businesses were financially distressed. Plaintiffs also alleged that Liberty's loan to them was governed by Minnesota's Consumer Fraud Act and that Liberty had violated the Act.

At trial, the judge concluded that, as a matter of law, the Consumer Fraud Act did not apply to plaintiffs' loan. The jury found that Joseph Baker had defrauded plaintiffs, that Liberty knew or had reason to know of the fraud, and that Liberty failed to tell plaintiffs of the fraud. The jury awarded damages of $123,431.83 to plaintiffs. After the trial, plaintiffs moved for judgment on the consumer fraud issue, or for a new trial on that issue. Liberty moved for judgment notwithstanding the verdict or for a new trial based on inconsistent jury instructions with respect to fraud, arguing that the evidence failed to establish circumstances which required Liberty to disclose confidential information to plaintiffs. The trial court denied all the motions and ordered that judgment be entered for plaintiffs. Liberty appealed. The court of appeals held that any error in the jury instructions was not fundamental and affirmed the jury verdict with respect to fraud. 527 N.W.2d at 591, 592. But the court of appeals reversed the district court's dismissal of the claim under the Consumer Fraud Act, holding that a bank loan constitutes a "service" within the purview of the Act, and remanded for a determination of attorney fees pursuant to the Act. *Id.* at 593.

On appeal, Liberty argues that it had no duty to disclose confidential information about its customer Joseph Baker unless it had actual knowledge of its customer's "irretrievable insolvency." Liberty also asserts that bank loans do not fall within the definition of "merchandise" under the Consumer Fraud Act, and therefore the Act does not protect bank loans. Liberty also contends that even if bank loans are covered by the Consumer Fraud Act, an award of attorney fees in this case is inappropriate under the private attorney general statute, Minn.Stat. § 8.31, subd. 3a (1994).

## I.

■ We first address the issue of whether Liberty had a duty to disclose information about the financial condition of its customer, Joseph Baker, and the bank's dealings with Joseph Baker, to plaintiffs. Plaintiffs, who borrowed money from Liberty for the purpose of investing in Joseph Baker's business ventures, assert that Liberty had a duty to disclose this information to them.

■ The existence of a legal duty is a question of law. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn.1985). On appeal, this court is not bound by lower court conclusions with respect to issues of law, and instead conducts an independent review of the record. *Hammer v. Investors Life Ins. Co.*

*of North America,* 511 N.W.2d 6, 8 (Minn. 1994). This court need not defer to the district court on a legal question. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

■ A party does not, absent special circumstances, have a duty to disclose to other parties to a transaction material facts relating to the transaction. *Klein v. First Edina National Bank,* 293 Minn. 418, 421, 196 N.W.2d 619, 622 (1972). In *Klein,* this court stated:

> [W]hen a bank transacts business with a depositor or other customer, it has no special duty to counsel the customer and inform him of every material fact relating to the transaction—including the bank's motive, if material, for participating in the transaction—unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.

*Klein,* 293 Minn. at 422, 196 N.W.2d at 623. In *Klein,* this court gave three examples of "special circumstances" in which a duty to disclose information exists:

> (a) One who speaks must say enough to prevent his words from misleading the other party.
>
> (b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party.
>
> (c) One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts.

*Klein,* 293 Minn. at 421, 196 N.W.2d at 622 (citations omitted). The *Klein* court did not specify that these examples were exclusive.

Plaintiffs do not argue that Liberty has spoken in a misleading fashion, the first of the *Klein* special circumstances; nor do plaintiffs argue that a fiduciary relationship existed between them and Liberty by virtue of any trust and confidence reposed in Liberty by plaintiffs, the third of the *Klein* special circumstances. Rather, plaintiffs assert that the examples in *Klein* are not exclusive and that caselaw has established other special circumstances in which parties have a duty to disclose information. For example, citing to *Richfield Bank & Trust Co. v. Sjogren,* 309 Minn. 362, 244 N.W.2d 648 (1976), plaintiffs argue that a bank's actual knowledge of a customer's fraud is a special circumstance in which a duty to disclose arises.

In *Richfield Bank & Trust Co.,* this court elaborated on the special circumstances in which parties have a duty to disclose information, holding that where a "bank had *actual knowledge* of the fraudulent activities of one of its depositors, it had an affirmative duty to disclose those facts to the [borrower] before it engaged in making the loan to the [borrower] which furthered the fraud." [2] 309 Minn. at 369, 244 N.W.2d at 652. In that case, the bank lent a borrower $44,750 for the purpose of purchasing 50 air purification units from an existing bank customer. The corporate officers of the bank's customer, National Pollution, and the bank's officer knew that National Pollution could not fulfill its contractual obligation to sell 50 air purification units to the borrower. Specifically, the bank officer knew, prior to the loan transaction, that National Pollution was on a "cash only" basis with its component supplier, that National Pollution had virtually ceased production of the units, that its production force had dwindled to one or two people, and that there were no more than 10 units in inventory. *Id.* at 364, 244 N.W.2d at 649–50. Under these facts, this court upheld

**2.** In *Richfield Bank & Trust Co.,* this court noted that disclosing facts concerning a depositor may, under some circumstances, constitute a breach of the bank's duty to its customers not to disclose confidential information. 309 Minn. at 369 n. 2, 244 N.W.2d at 652 n. 2. Additionally, amicus Minnesota Bankers Association directs the court to Minn.Stat. § 51A.11, subd. 1 (1994) regarding a bank's duty of confidentiality: "[t]he books and records pertaining to the accounts, loans * * * of depositors, borrowers, or stockholders shall otherwise be kept confidential * * *." *Id.*

Note: In *Richfield Bank & Trust Co., Minnesota Reports,* the official reporter for this court in 1976, correctly states "affirmative duty to *disclose,*" while *Northwestern Reporter 2nd* incorrectly states "affirmative duty to *disclosure.*" (emphasis added).

a finding of actual knowledge of fraud. *Id.* at 368, 244 N.W.2d at 652.

In determining whether the bank had actual knowledge of fraud, the court in *Richfield Bank & Trust Co.* asked:

> [W]hether Richfield Bank, through its loan officer, Michael Thompson, actually knew that National Pollution was *so irretrievably insolvent that it had no reasonable expectation of fulfilling its obligations under the contract with respondents.* If Richfield Bank knew only that National Pollution was insolvent, as opposed to irretrievably insolvent, it would not have actual knowledge of fraud and thus would not be under a duty to disclose the financial condition of its depositor to respondents.

*Id.* at 368, 244 N.W.2d at 651 (emphasis added). The court concluded that the bank, through its loan officer, knew that National Pollution was so irretrievably insolvent that it had no reasonable expectation of fulfilling its obligations. *Id.* at 368, 244 N.W.2d at 652. "Irretrievable insolvency" is thus defined in *Richfield Bank & Trust Co.* as the condition of having no reasonable expectation of fulfilling one's obligations. *Id.* at 367–68, 244 N.W.2d at 651. Mere insolvency is not sufficient: " 'The cases make a distinction between known irretrievable insolvency and where there is insolvency accompanied by reasonable hopes that by continuing the business fortune may be retrieved.' " *Id.* at 368, 244 N.W.2d at 651 (quoting *Forsythe v. First State Bank of Mentor,* 185 Minn. 255, 258, 241 N.W. 66, 67 (1932)). In *Richfield State Bank & Trust Co.,* the facts indicate that the bank officer knew the customer was irretrievably insolvent; thus, the bank had actual knowledge of fraud, and therefore the bank was under a duty to disclose to the borrower that financial condition of irretrievable insolvency, not the fraud itself. The court of appeals applied the *Richfield Bank & Trust Co.* rule in *MacKenzie v. Summit Nat'l Bank,* pointing out that an entity's "precarious financial condition" rather than "irretrievable insolvency" does not support a duty to disclose. 363 N.W.2d 116, 120 (Minn.App. 1985).

Other jurisdictions have explored the question of when a duty to disclose arises out of special circumstances, and have determined that such special circumstances exist when parties are not dealing at arm's length and when one party knows of the insolvency of another but does not reveal it. *See Bank of Red Bay v. King,* 482 So.2d 274, 285 (Ala. 1985) ("When both parties are intelligent and fully capable of taking care of themselves and dealing at arms' length, with no confidential relations, no duty to disclose exists when information is not requested, and mere silence is then not a fraud. There must be active concealment or misrepresentation.").

■ The dissent asserts that we have taken the fact-specific application of a broad general rule in *Richfield Bank & Trust Co.* and hardened it into a rigid limitation which holds that "only knowledge of irretrievable insolvency must be disclosed." But that is not our holding. Nor do we, as the dissent asserts, conclude that disclosure is "only necessary when the bank is aware of fraud perpetrated by virtue of the customer's financial condition." Rather, we adhere to the standard set out in *Klein* and *Richfield Bank & Trust Co.* that, if the bank has special knowledge of material facts to which the other party does not have access, it has a duty to disclose.

In *Richfield Bank & Trust Co.,* we found an exception to the general rule that a bank has no duty to disclose a customer's financial condition. In that case, the bank had actual knowledge that the customer was irretrievably insolvent and this actual knowledge constituted "special knowledge of material facts to which the other party does not have access." *See Richfield Bank & Trust Co.,* 309 Minn. at 368–69, 244 N.W.2d at 651–52; *see also Klein,* 293 Minn. at 421, 196 N.W.2d at 622. In *Richfield Bank & Trust Co.,* the bank officer had access to information which was not available to the plaintiff. The bank officer "was an active participant in the affairs and decisions of the company and, indeed, was described by one of the employees of National Pollution as 'calling all the shots' for National Pollution." *Id.* at 365, 244 N.W.2d at 650. Therefore, we concluded that the bank had a duty to disclose. *Id.* at 369, 244 N.W.2d at 652.

In the instant case, the plaintiffs have claimed that the bank had knowledge of Joseph Baker's fraudulent activities. It is axiomatic that fraud may not be alleged generally, but must be pleaded with particularity. *See Rogers v. Drewry,* 196 Minn. 16, 20, 264 N.W. 225, 226 (1935). Because fraud must be pleaded with particularity, plaintiffs allege in their complaint that Liberty breached its duty in not disclosing to them four specific facts: that Joseph Baker planned to use $40,000 of the loan to pay other obligations at Liberty; that $35,000 had been drawn from Apopka's line at Liberty; that Liberty persuaded Norwest to subordinate its security interest in the equipment to Liberty's; and that there were overdrafts on the Old Library Restaurants' account.

When a concealed fact is not peculiarly within a defendant's knowledge and is readily ascertainable, the failure to disclose that fact does not amount to fraud. *See Egan v. Thorpe Bros.,* 195 Minn. 370, 371, 263 N.W. 109, 110 (1935). Fraud is proved with reference to specific intelligence and experience of the aggrieved party rather than the reasonable person standard. *Murphy v. Country House, Inc.,* 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976). The general rule set out and applied in *Richfield Bank & Trust Co.* is that a duty to disclose exists if one party has special knowledge of material facts to which the other party does not have access. In this case, the plaintiffs had access to each of the material facts before they entered the transaction. Plaintiffs were sophisticated businessmen, but they neither asked Joseph Baker what he was going to do with the money advanced to him, nor did they prepare or sign any written agreement specifying how Joseph Baker could use the money. Joseph Baker was in no way restricted from using $40,000 to pay other obligations at Liberty. Further, Wittek testified that if the plaintiffs had asked him where the money was going, he would have "directed them to Joe Baker."

Plaintiffs did not ask whether any funds had been drawn on Apopka's line of credit. The amount of money remaining available on the Apopka line of credit would have been set out in Joseph Baker's financial statements had plaintiffs requested them. Plaintiffs, one of whom was an experienced transactional lawyer, also did not search UCC records to determine if a filing had been made on equipment they claim to have counted on as security for their investment. Liberty had filed a UCC financing statement on that equipment, and that duly-filed financing statement gave plaintiffs constructive notice of the existence of Liberty's security interest. *See Williams v. Dow Chemical Co.,* 415 N.W.2d 20, 27 (Minn.App.1987) (citing *Klein v. First Edina Nat'l Bank,* 293 Minn. at 421, 196 N.W.2d at 622 (1972), *pet. for rev. denied* (Minn.App., May 2, 1989)). Liberty had no duty to disclose that fact. Finally, the existence of overdrafts on the Old Library Restaurants' account would have been revealed in Joseph Baker's financial statements had the plaintiffs requested them. It is customary, even elementary, that in investing money with a party, one reviews that party's financial statements. In this case, William Baker testified that "when I first met with Liberty, I said Joe mentioned there's a $250,000 line being worked on and that's, and that was confirmed. So, I mean, I'm embarrassed about that, but I didn't ask my brother for, where's your financials."

The record amply demonstrates that the information plaintiffs claim was not disclosed to them was readily available to them from Joseph Baker himself and from the publicly recorded UCC filings. Because Liberty did not have special knowledge of material facts to which Boubelik and William Baker did not have access, Liberty had no duty to disclose the information plaintiffs recite.

A clear standard with regard to a bank's duty to disclose the financial condition of its customer is necessary to avoid uncertainty regarding disclosure in bank lending transactions such as this one between Liberty and the plaintiffs. Requiring, as *Richfield Bank & Trust Co.* does, actual knowledge of a customer's fraudulent activities to impose a duty to disclose suggests that banks must have a clear understanding of what constitutes "fraudulent activities." Knowledge of irretrievable insolvency provides a clear standard regarding what constitutes "fraudulent activities" with respect to a party's financial

condition. While it is within the accepted province of a bank's function to investigate its customer's financial condition and to determine if a customer is irretrievably insolvent such that the customer has no reasonable expectation of meeting its obligations, to apply a standard other than knowledge of its customer's irretrievable insolvency presents at least two undesirable results. First, a standard other than knowledge of irretrievable insolvency could imply that a bank has a duty to investigate beyond its normal inquiry into the customer's financial condition. Second, such a standard could encourage borrowers to relinquish their own obligation to investigate their investments, and to rely on the bank for protection from risk.

As a practical matter, it is important for banks to have a clear understanding of any duty to disclose, especially in light of the countervailing duty *not* to disclose their customers' confidential information. *See Richfield Bank & Trust Co.*, 309 Minn. at 366, 244 N.W.2d at 651 (citations omitted). In the instant case, hindsight has led the plaintiffs to select information pertaining to Joseph Baker's financial condition which they now deem material. It is much more difficult for a bank to predict which pieces of information regarding a customer's financial condition might be subject to a duty to disclose. However, when a bank has knowledge of a customer's irretrievable insolvency, that is, knowledge of a customer's inability to meet obligations, there is a bright line standard of the duty to disclose information regarding the customer's financial condition by which banks and customers may more readily comprehend their relationship. We conclude that when a bank has knowledge of a customer's irretrievable insolvency, it is reasonable to impose a duty to disclose this information regarding the customer's financial condition to a third-party customer of the bank contemplating a loan transaction with the bank involving the irretrievably insolvent party.

We note that the court of appeals in this case determined that the bank knew of Joseph Baker's "dire financial condition," but we reiterate the conclusion of this court in *Richfield Bank & Trust Co.* that knowledge of insolvency is not necessarily equivalent to knowledge of fraud. *Richfield Bank & Trust*

*Co.*, 309 Minn. at 367, 244 N.W.2d at 651. Knowledge of a precarious financial condition is not sufficient to require disclosure by a bank. *See MacKenzie*, 363 N.W.2d at 120. The condition must be that of irretrievable insolvency. We also note that if plaintiffs had been able to make out a case of specific fraud against the bank, the bank would have been liable for harm to the plaintiffs. Plaintiffs did not pursue a claim of fraud against the bank, and at oral argument acknowledged that such a claim did not develop well in the facts.

## II.

Having determined that knowledge of a customer's irretrievable insolvency triggers a bank's duty to disclose, we apply that standard to the facts of this case. Under that standard, Liberty maintains there is no evidence showing that, at the time of the loan, Joseph Baker was irretrievably insolvent. We agree. During the time period surrounding the loan, Joseph Baker refinanced his home with another lender, indicating that Joseph Baker was not then so irretrievably insolvent that he had no reasonable expectation of fulfilling his obligations, at least not in the opinion of the lender who refinanced his home. Additionally, Liberty made further loans to Joseph Baker after the April 12 loan to plaintiffs, thereby indicating Liberty's belief that Joseph Baker was not irretrievably insolvent. Further, Joseph Baker continued to operate his business ventures and did not file for bankruptcy protection until 17 months after the April 12 loan was made.

As we previously noted, plaintiffs are experienced in the business arena, Boubelik as a corporate officer of a large corporation and Baker as an attorney with experience both as a private attorney and as corporate counsel. As one court has stated, parties seeking to borrow money from a bank:

> [c]annot avoid the responsibility of exercising reasonable diligence for [their] own protection by relying on [their] bank to provide [them] with information which was not specifically requested and which was otherwise readily available. To adopt such a standard would put an intolerable obli-

gation upon banking institutions and convert ordinary day-to-day business transactions into fiduciary relationships where none were intended or anticipated.

*Denison State Bank v. Madeira,* 230 Kan. 684, 696, 640 P.2d 1235, 1243 (1982). In this case, the plaintiffs did not exercise reasonable diligence regarding their transaction. Plaintiffs admitted that they did not inquire into Joseph Baker's financial condition themselves. They did not examine financial statements, tax returns, credit references, or conduct a search of the recorded financing statements with regard to the equipment they claim to have relied on as security for the loan. This information was readily available and they did not specifically request it. We decline to impose an obligation on Liberty to disclose information that reasonable diligence on the part of the plaintiffs would have revealed.

Because plaintiffs have not shown that Liberty had actual knowledge of Joseph Baker's irretrievable insolvency, Liberty had no duty to disclose Joseph Baker's financial condition to plaintiffs. We therefore reverse the decision of the court of appeals and hold that, on the facts of this case, Liberty had no duty to disclose information concerning its dealings with its customer, Joseph Baker.

### III.

We next turn to the question whether Minnesota's Consumer Fraud Act applies to loans made by banks. Construction of a statute is a question of law and fully reviewable by an appellate court. *See Hibbing Educ. Ass'n v. Public Employment Relations Bd.,* 369 N.W.2d 527, 529 (Minn.1985). Application of a statute to a set of undisputed facts is a question of law, not binding on this court. *See A.J. Chromy Constr. Co. v. Commercial Mechanical Servs., Inc.,* 260 N.W.2d 579, 582 (Minn.1977).

In their complaint, plaintiffs alleged that Liberty violated Minnesota's Consumer Fraud Act, Minn.Stat. §§ 325F.68–.70, (the Act) by defrauding or misleading the plaintiffs in connection with the sale of merchandise to plaintiffs, specifically the loan. Accordingly, plaintiffs seek attorney fees and costs incurred in proceeding with their action against Liberty pursuant to the Act. Plaintiffs argue that Minnesota's private attorney general statute, Minn.Stat. § 8.31, subd. 3a, allows them to recover attorney fees and costs for a violation of the Act because Liberty's actions have the potential to deceive and ensnare members of the consumer public. The Act prohibits:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise.

Minn.Stat. § 325F.69, subd. 1. The Act defines "sale" as "any sale, offer for sale, or attempt to sell any merchandise for any consideration," Minn.Stat. § 325F.68, subd. 4, and further defines "merchandise" as "any objects, wares, goods, commodities, *intangibles,* real estate, or *services.*" Minn.Stat. § 325F.68, subd. 2 (emphasis added).

Consumer protection statutes are remedial in nature and are to be liberally construed in favor of protecting consumers. *State v. Alpine Air Prods.,* 490 N.W.2d 888, 892 (Minn.App.1992), *aff'd,* 500 N.W.2d 788 (Minn.1993). The Act does not expressly limit its protection to individual consumers, nor has the Act been so interpreted by the courts. *See, e.g., Church of the Nativity of Our Lord v. WatPro, Inc.,* 491 N.W.2d 1, 8 (Minn.1992).

The district court in this case ruled that the Act does not apply to loans, such as Liberty's loan to plaintiffs, and denied plaintiffs' motion for a new trial on that issue. The court of appeals opined that it would afford the Act a liberal construction, determined that borrowers expect to pay closing costs or a use fee for the bank's lending services, and held that a loan is a "service" within the meaning of the Act. *Boubelik,* 527 N.W.2d at 593.

This court has not yet addressed the issue of whether bank loans are subject to the Act. Plaintiffs and Amicus Minnesota Attorney General argue that bank loans fall squarely within the meaning of "services" under the Act, maintaining that a bank loan is "nothing other than a 'service' provided by a lender

that allows a borrower, in exchange for fees and interest payments, to obtain funds for * * * investment in a business." Liberty argues that the specific words of the statute do not include bank loans, nor does the dictionary definition and common usage of the term "services" include bank loans. Liberty asserts that the legislature could have specifically included bank loans within the definition of "merchandise," but chose not to do so. We agree with Liberty and conclude that bank loans do not fall within the meaning of "services" under the Act.

Other jurisdictions have reached similar conclusions in analogous situations. The Massachusetts Supreme Court has held that mortgage borrowers did not qualify as "purchasers" under the then-applicable consumer protection statute, noting that "the principle counseling us to construe [the statute] broadly does not urge us to adopt a construction that outstrips the intent of the Legislature." *Murphy v. Charlestown Sav. Bank,* 380 Mass. 738, 744, 750, 405 N.E.2d 954, 958, 961 (1980).

The Federal District Court for the District of Minnesota also concluded that a loan of money is not a sale within the Clayton Act, an amendment to the Sherman Antitrust Act which deals with unfair trade practices, and observed:

> It is difficult to conceive of a transaction for a loan of money as being a lease, sale, or contract for sale of a commodity. Certainly, the loan is not a sale in the usual business sense. A sale is an absolute transfer of property or something of value for a consideration from the seller to the buyer. * * * One does not 'sell' money in the usual business sense.

*United States v. Investors Diversified Servs., Inc.,* 102 F.Supp. 645, 647 (D.Minn.1951); *see also Shawmut Community Bank v. Zagami,* 411 Mass. 807, 586 N.E.2d 962 (1992) (holding that, under *Murphy,* loans and mortgages are not purchases within the applicable statute); *DiBernardo v. Mosley,* 206 N.J.Super. 371, 375, 376, 502 A.2d 1166, 1167, 1168 (N.J.Super.Ct.App.Div.) (holding that the consumer fraud act does not apply to the sale by a homeowner of a single-family home where there is no clear expression of intent by the legislature to include such sales and that there is a need to place reasonable limits on the operation of the Act), *certification denied,* 103 N.J. 503, 511 A.2d 673 (1986).

While we do agree with the dissent that the Minnesota legislature has afforded Minnesotans various consumer protections, we do not agree that this requires us to interpret Minnesota's Consumer Fraud Act as covering all bank loans. Public policy not only includes protection for consumers who enter certain transactions in an unequal bargaining position, but it also includes the freedom for sophisticated parties to borrow and to invest moneys subject to certain risks. The Act does not clearly include bank loans within its protections. It is not the role of the judiciary to extend the policy of consumer protection beyond the language of the statute. To do so would require us to invade the province of the legislature, and this we decline to do.

Because we conclude that bank loans do not come within the Act's definition of merchandise and are therefore not governed by the Act, there is no need to remand to the district court to determine whether attorney fees are appropriate under the Act by virtue of Minnesota's private attorney general statute.

Reversed.

GARDEBRING and PAGE, JJ., dissent.

GARDEBRING, Justice (dissenting).

Today, the majority strips away protection for banking consumers that has long been afforded by both the legislature and the courts. To do so, the majority invades the province of the jury and ignores clearly expressed legislative intent. I disagree.

Initially I part company with the majority on its interpretation of the standard for determining when a bank must disclose the fraudulent activity of one of its customers to another of its customers. The majority has, I believe, misinterpreted our prior holdings on this subject and, in so doing, has overruled portions of them *sub silentio.*

As the majority notes, the general rule, originating in common law, is that one is

under no duty to disclose the fraud of another. However, this court, like courts in many other jurisdictions has carved out an exception where "special circumstances" exist. *Klein v. First Edina National Bank,* 293 Minn. 418, 421, 196 N.W.2d 619, 622 (1972). Among those special circumstances which trigger a duty to disclose is "special knowledge of material facts to which the other party does not have access." *Id.*

Four years after the *Klein* decision, in *Richfield Bank & Trust Co. v. Sjogren,* 309 Minn. 362, 244 N.W.2d 648 (1976), this court had occasion to apply this rule and did so by imposing a duty to disclose upon a bank that had actual knowledge of the irretrievable insolvency of one its customers, a manufacturer of pollution control equipment. We held that under those specific circumstances, the bank had a duty to inform another party that the manufacturing company was indeed insolvent and virtually out of business before loaning the party some $45,000 to purchase air pollution equipment from the manufacturer. *Id.* at 369, 244 N.W.2d at 652.

The court noted that the jury had specifically found that the manufacturing company was defrauding the Sjogrens and that the loan officer was aware of it. *Id.* at 368, 244 N.W.2d at 651–52. Acknowledging its usual unwillingness to overturn a jury verdict supported by the evidence, the court held that the bank had "*actual knowledge* of the fraudulent activities of one of its depositors" and thus "an affirmative duty to disclose those facts to the [borrower] before it engaged in making the loan to the [borrower] which furthered the fraud." *Id.* at 369, 244 N.W.2d at 652. Thus, the *Richfield Bank & Trust Co.* case is the court's most recent application of the *Klein* rule that actual knowledge of material facts unknown to a third party may give rise to a duty to disclose. In *Richfield Bank & Trust Co.,* the "material facts" at issue related to the irretrievable insolvency of the depositor.

However, the majority has now taken that single, fact-specific application of the broad, general rule—that knowledge of material facts may give rise to a duty to disclose—and hardened it into a rigid limitation, holding that *only* knowledge of irretrievable insolvency must be disclosed. To the contrary, there is nothing in either the *Klein* or the *Richfield Bank & Trust Co.* decisions that suggests that the only possible "material facts" which can give rise to a duty to disclose are those which relate to "irretrievable insolvency." In *Richfield Bank & Trust Co.,* the bank's actual knowledge of the manufacturer's fraudulent activity indeed was derived from its knowledge that the company was so irretrievably insolvent that it could not meet its obligations. *Id.* at 368, 244 N.W.2d at 651–52. In the instant case Liberty Bank had actual knowledge of fraud, based upon Joseph Baker's own comments: in meetings January 3 and 9, 1990 with John Wittek, Baker promised to use the loan proceeds, not to begin the Lindsay's Bar venture as he told the plaintiffs, but instead to pay down some of his debts to Liberty. Surely, actual knowledge of fraud, whether caused by irretrievable insolvency or merely larcenous intent, is exactly the type of "material fact" that this court intended to trigger the duty to disclose.

The *Richfield Bank & Trust Co.* court held that disclosure was compulsory when a bank knows of fraud being perpetrated by one of its customers in a loan transaction. Today, the majority distorts that holding to conclude that such disclosure is necessary only when the bank is aware of fraud perpetrated by virtue of the customer's financial condition. After reading the majority's analysis, one is left with the question: why is a consumer protected against one type of fraud and not another, when the knowledge to prevent each is within the grasp of the bank and, in each case, unknown to its customer?

Finally, it is important to keep in mind that this case comes to us with a jury verdict of fraud that is supported by the evidence. The jury specifically found that Joseph Baker defrauded the plaintiffs, that Liberty knew or had reason to know of Baker's fraud, and that Liberty failed to inform plaintiffs of this fraud. Normally, we do not overturn jury verdicts lightly. *Roemer v. Martin,* 440 N.W.2d 122, 124 (Minn.1989); *State v. Robinson,* 262 Minn. 79, 85, 114 N.W.2d 737, 741 (Minn.1962) (quoting *Fayerweather v. Ritch,* 195 U.S. 276, 306–307, 25

S.Ct. 58, 67–68, 49 L.Ed. 193 (1904)), *cert. denied,* 371 U.S. 815, 83 S.Ct. 26, 9 L.Ed.2d 56 (1962). We have also previously made well-known our significant hesitancy to supplant our judgment for that of the jury. *See Vikse v. Flaby,* 316 N.W.2d 276, 283 (Minn. 1982); *Otterness v. Horsley,* 263 N.W.2d 403, 405 (Minn.1978).

The existence of the jury's verdict on plaintiff's fraud claims against Baker also seems to me to counter the majority's long discussion on the nature of fraud and the ability of plaintiffs to discover that fraud. The question of whether plaintiffs could have learned of Joseph Baker's fraudulent plans for the borrowed funds has been answered by the jury. It determined that the bank knew Joseph Baker intended to use the money in a manner different from that communicated to the plaintiffs and that the bank knew of that fraud—indeed, Joseph Baker's promise to use the money differently seems central to the bank's decision to loan the money. Having considered the plaintiffs' ability to uncover the fraud themselves, the jury nevertheless found both that Baker defrauded the plaintiffs and that the bank knew about it. Nothing more than that is required by *Richfield Bank & Trust Co.* to trigger the duty to disclose. A discussion of what the jury might have found, but didn't, is not germane to the question at hand. The majority notes, with regard to interpreting the Consumer Fraud Act, that it is unwilling to invade the province of the legislature; yet it has chosen to overlook the jury's decision in this matter. Such a jury verdict should not be ignored.

Public policy, precedent, and common sense should not be ignored. The legislature has seen the perpetration of fraud in consumer transactions and responded with consumer protection statutes. Courts, generally, responded by giving those statutes broad interpretation. The jury in this instance responded with its verdict. But, today, the majority responds by allowing, in this as well as future instances, the legal concealment of fraud by banks.

On the second issue, I conclude that the Consumer Fraud Act applies to bank loans. The Act prohibits "any person" from using "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise." Minn.Stat. § 325F.69 (1994). As used in the Act, "merchandise" refers to "any objects, wares, goods, commodities, intangibles, real estate, or services." Minn.Stat. § 325F.68, subd. 2 (1994).

In my view, the majority's determination that a loan—essentially the provision of sums of money for a period of time in exchange for fees and interest payments—is outside the reach of the Act defies its intended expansive protection. When creating the Act, the legislature did not exclude any sort of transaction from its purview—it created an expansive, far reaching statute to protect consumers as much as possible from unfair practices, including fraud. The court of appeals in this case recognized that fact when it stated that the "onus is on the legislature to exclude, rather than include, loans from within the protection of the Act." *Boubelik v. Liberty State Bank,* 527 N.W.2d 589, 593 (Minn.App. 1995).

This state's attorney general has attempted to further this anti-fraud policy with aggressive prosecution of violators of the Act. However, even the attorney general does not have unlimited resources; again, in keeping with the public policy against consumer fraud, the legislature recognized this fact and allowed private individuals to enforce the Act as so-called "private attorneys general." *See* Minn.Stat. § 8.31, subd. 3a (1994).

Courts as well have been aware of this policy in favor of consumers and have interpreted the definition of "merchandise" broadly. For example, in *Jenson v. Touche Ross & Co.,* 335 N.W.2d 720 (Minn.1983), we determined that because the term "merchandise" is defined in the act as including both "commodities" and "intangibles," the Act applied to sale of investment contracts. *Id.* at 728. Similarly, in my view, a loan may be characterized as either the sale of money or the sale of the use of money, but in any case it is an intangible or a service within the common sense meaning of these terms and clearly within the statute. To rule otherwise is not only inconsistent with the plain mean-

ing of the statute, but utterly irreconcilable with *Jenson*.

The majority contends that the Act clearly does not include bank loans in its protections and implies that a judicial determination otherwise would somehow imperil the ability of sophisticated parties to borrow and invest. Yes, the text of the Act does not mention bank loans, but neither did it mention investment contracts, yet we decided such investment devices were included within the purview of the Act. Has the *Jenson* decision had a negative impact on the investment industry?

Further, courts in other jurisdictions have included bank loans within the ambit of their states' consumer protection statutes. *See, e.g., Smith v. Commercial Banking Corp.,* 866 F.2d 576, 582 (3rd Cir.1989) (determining that mortgage transactions are within the scope of Pennsylvania's consumer protection statute); *Villegas v. Transamerica Financial Servs.,* 147 Ariz. 100, 102, 708 P.2d 781, 783 (App.1985) (loan of money is a sale of present use of money on future promise to repay); *Baird v. Norwest Bank,* 255 Mont. 317, 328, 843 P.2d 327, 333–34 (1992) (consumer loan by bank is a service and thus falls within Montana's consumer protection statute); *Allan v. M & S Mortgage Co.,* 138 Mich.App. 28, 43, 359 N.W.2d 238, 245 (1984) (loan is "distribution of a service" within definition of Michigan Consumer Protection Act). The theories differ slightly from jurisdiction to jurisdiction, but the central theme of expansively reading consumer protection statutes to protect consumers seeking loans remains.

The creation of this statute and the broad application given to it by courts, including this court prior to today's ruling, reflect a public policy of low tolerance for fraudulent business activity. *See, e.g., State by Humphrey v. Alpine Air Products, Inc.,* 490 N.W.2d 888, 892 (Minn.App.1992), *aff'd* 500 N.W.2d 788, 790 (Minn.1993). The majority disregards these public considerations and long standing efforts to deter fraudulent activity. Instead, the majority, somewhat arbitrarily in my view, has imposed a narrow reading on a statute intended to be broad

and exempted bank loans from the Consumer Fraud Act's purview.

Finally, I note that the majority concludes that a decision to include bank loans within the reach of the Act would require us to invade the province of the legislature. I disagree. The majority obviously does not agree with me that a bank loan comes within the reach of the Act, but a disagreement on interpretation of a statute does not rise to the level of an assault on the role of the legislature. Indeed, the task of the judiciary is to interpret legislative enactments, taking into account the legislature's intent, as best we can determine it, as well as our own past precedents. Should the legislature disagree with a judicial interpretation that a bank loan is covered by the Act, its path is clear.

I respectfully dissent.

PAGE, Justice (dissenting).

I join the dissent of Justice GARDEBRING.